## A. W. LEGG AND WILLIAMENA LEGG, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2407–69.   Filed November 1, 1971.

*C. W. Franklin* and *William C. Ruthford*, for the petitioners.
*Richard J. Shipley*, for the respondent.

STERRETT, *Judge:* The Commissioner initially determined deficiencies in petitioners' Federal income taxes, as follows:[1]

| Year | Amount |
|---|---|
| June 30, 1965 | $15, 450. 14 |
| June 30, 1966 | 601. 89 |

By an amendment to his answer the Commissioner has alleged that the deficiency for the taxable year ended June 30, 1966, should be increased to $3,043.27.[2]

Due to concessions, the issues remaining for our determination are:

(1) Whether the transfer of a real estate installment sales contract to an inter vivos trust produces a taxable gain and if so, to what extent. This requires us to determine if:

(a) the transfer was considered to be a disposition within the meaning of section 453(d), I.R.C. 1954,[3] and, if the answer be in the affirmative;

(b) the fair market value of the above-mentioned installment obligation at the time of the transfer.

---

[1] The tax for the year ended June 30, 1967, was also recalculated, however the Commissioner assessed no deficiency.

[2] The increased deficiency is based on two theories, the first of which deals with the right to a charitable contribution carryover. It raises no new issues and therefore the burden of proof remains with the petitioners. The second concerns the existence of an annuity and in a technical sense raises a new issue placing the burden upon the respondent. See Rule 32, Tax Court Rules of Practice. However, this is insignificant in light of the fact that the question presented is purely a legal one.

[3] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

(2) Whether during 1965 the A. Z. Wells Foundation, a charitable trust, was publicly supported within the meaning of section 170(b)(1)(A). This determination will lead us to a conclusion concerning the petitioners' right to:

(a) deduct a charitable contribution to the extent of 30 percent of their adjusted gross income and;

(b) carry over the remaining charitable contribution to the following years.

(3) In the alternative if we determine that a disposition has in fact occurred, then we must decide if the required $6,000-per-year payment was the payment of an annuity or merely the receipt of interest.[4]

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioners, A. W. Legg, born March 4, 1902, and Williamena Legg, born June 14, 1898, are husband and wife and their legal residence was Manson, Wash., as of the date their petition was filed with the Tax Court. Their joint Federal income tax returns for the fiscal years ended June 30, 1965, and June 30, 1966, were filed with the district director of internal revenue at Tacoma, Wash.

The petitioners have been engaged in operating an apple orchard near Manson, Wash., since 1925. The business of growing apples is an extremely hazardous economic occupation. The grower is subject not only to the everchanging supply and demand but in addition must suffer with sudden frosts, hailstorms, and drought. If an orchard is destroyed by the elements it takes approximately 15 years to return the trees to full production. In this regard, on March 22, 1965, the petitioners having experienced some adverse years in the fruit-growing business and having advanced in age, sold a large part of their orchard, about 30 acres, plus some equipment to the Wells & Wade Fruit Co. under a real estate contract. The contract fixed the sales price at $140,000, the fair market value of the property sold, with a

---

[4] In the statutory notice of deficiency the respondent contended that the petitioners had disposed of their installment contract and had received an annuity to the extent of the retained annual payment of $6,000. This determination required an adjustment in the taxation of the payment; since it was treated as an annuity $4,707.34 was excluded as return of capital. The petitioners contested the existence of the disposition and the annuity. Thereupon, the respondent conceded the nonexistence of an annuity, thus necessitating, according to the respondent, the taxation of the full $6,000 per year as interest, as was initially done by the petitioners in their return. However, the petitioners in their reply to the amended answer denied this treatment, thus demonstrating their position that if in fact a disposition was determined to have occurred then an annuity must also be found to exist.

$20,000 downpayment required. The contract provided that the petitioners could only receive interest at a rate of 5 percent per annum on the principal balance owing of $120,000. No principal payment would be due during their lives; the entire amount became due and payable upon the death of the survivor. The contract also contained a provision requiring the creation of an "Accumulation Trust Fund," into which the purchaser was to deposit the profit of the orchard so as to further secure the payment of the 5-percent interest.

The $20,000 downpayment was paid by the purchaser to petitioners and was reported on Schedule D of their Federal income tax return for the fiscal year ended June 30, 1965, as long-term capital gain. In their return, petitioners elected to report the gain from this sale on the installment basis under the provisions of section 453(b).

On the same date, March 22, 1965, petitioners executed an agreement with the Seattle-First National Bank as trustee for the creation of an irrevocable living trust. They also executed an assignment of contract and deed conveying to the bank as trustee the real estate contract with Wells & Wade Fruit Co. According to the terms of the trust the petitioners retained the right to receive $6,000 per year from income or if necessary from corpus, an amount identical with the amount of annual interest due under the real estate contract, for their joint lives which amount could, at the option of the trustee, be reduced by annual trustee's fees. The fee charged was $10 per year subject, however, to increase if additional work was required. At their death the principal of the trust was to be distributed to the charitable trust known as the A. Z. Wells Foundation (sometimes referred to herein as the foundation).

On their income tax return for the taxable year ended June 30, 1965, petitioners claimed a deduction for a charitable contribution to the A. Z. Wells Foundation in the amount of $7,504.85. This deduction was based upon an estimated present value of the remainder interest provided for the foundation in the petitioners' inter vivos trust. In the following year ended June 30, 1966, they claimed a carryover of this item in the amount of $10,241.20.

Wells & Wade Fruit Co., the purchaser of petitioners' orchard property, is a well-established corporation located in Wenatchee, Wash. It is engaged exclusively in growing and marketing fruit, primarily apples, and its financial position was secure and substantial. It is and was at all times material thereto wholly owned by the Seattle-First National Bank, as trustee under a testamentary trust created by the will of A. Z. Wells. The trust is commonly known as the A. Z. Wells Foundation.

The A. Z. Wells Foundation was a charitable trust in 1965 as defined in section 170(c)(2) and hence contributions to it were deductible. At its creation in 1950 the foundation, through its trustee, owned stock in two corporations valued at $2 million. The will of A. Z. Wells, which created the foundation, lists all possible beneficiaries including certain charitable agencies, nonprofit hospitals, and certain student scholarships. The Seattle-First National Bank, as trustee, determines the amount available for distribution, and a separate committee determines the allocation of available funds to the named beneficiaries. From 1951 through 1970 the foundation received and distributed or accumulated income in the amount of $1,015,454. During this same period of time the foundation's two subsidiaries had entered into four or five transactions similar to petitioners' sale of their orchard and donation of the remainder interest in the contract. The potential value of these future interests was approximately $600,000. Only one such item amounting to $90,000 has actually been received by the foundation. There have been no other major contributions by the public. A news release each year notes the total amount distributed by the foundation but it does not include any detail concerning the specific amounts donated to the separate beneficiaries nor does it explain in any way the operations and finances of the foundation.

## OPINION

The case at bar, unusual on its facts, presents for our determination three issues, the first of which relates to the applicability of section 453(d), dealing with the disposition of an installment obligation, to the transfer of an installment sales contract to an irrevocable trust.

Section 453(d) states in part:

SEC. 453. INSTALLMENT METHOD.

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

In order to properly consider the relevant issues in question it is necessary to quickly summarize the facts. The petitioners sold an

apple orchard for $140,000, received a downpayment of $20,000, and elected to report the transaction on the installment method as permitted by section 453. However, petitioners were only to receive interest of 5 percent per year on the unpaid principal or $6,000; the remaining portion of the contract price being payable on their death. Contemporaneously therewith the petitioners executed an irrevocable trust, funded with the installment sales contract, in which they were to receive an annual payment of $6,000; the corpus payable upon their death to a charitable foundation.

The respondent asserts that the transfer of the installment sales contract to the trust was a disposition of an installment obligation within the meaning of section 453(d) and therefore gain must be recognized to the extent of the difference between the basis of the obligation and its fair market value. He relies heavily on the legislative history of the predecessor of section 453(d), section 44(d) initially enacted as part of the Revenue Act of 1928, which is nearly congruent to the language of section 453(d). In its enactment Congress noted the following:

Subsection (d) contains new provisions of law to prevent evasion of taxes in connection with the transmission of installment obligations * * * by way of gift, or in connection with similar transactions. * * * The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash payments are made. To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits. [H. Rept. No. 2, 70th Cong., 1st Sess., p. 24 (1928), 1939-1 C. B. (Part 2) 394-395.]

It is evident from the above language that the congressional purpose for enacting section 453(d) was to prevent tax avoidance by requiring a taxpayer who disposes of his installment obligation *in any manner*,[5] to pay the remainder of the tax due. It seems apparent that the facts at hand fall squarely within the purview of the statute; the petitioners irrevocably conveyed the principal interest of an installment sales contract to a trust. Though the conveyance was the gift of a remainder interest, the legislative history indicates that a gift is a disposition within the meaning of section 453(d).[6] This is indeed appropriate for otherwise, and as the petitioners view the instant transaction, the transferor would receive an immediate charitable deduction while still

---

[5] The transmissions, distributions, or dispositions excluded from sec. 453(d) treatment are for the most part listed within that section. The transaction involved herein is not so excluded.

[6] For an extensive discussion see Emory, "Disposition of Installment Obligations: Income Deferral, 'Thou Art Lost and Gone Forever,'" 54 Iowa L. Rev. 945 (1969); Jones, "A Tax-Trap for the Unwary; The Disposition of Installment Obligations," 29 Montana L. Rev. 43 (1961).

spreading his gain over a period of time. Therefore, it would seem that in the instant case the yet unrealized gain must immediately be recognized.

In support of this conclusion we note that in *Marshall* v. *United States*, 26 F. Supp. 580 (S.D. Cal. 1939), the taxpayer transferred an installment sales obligation to an irrevocable trust, income to benefit the taxpayer. The court found that since there was an irrevocable transfer, a disposition did in fact occur so as to render the taxpayer liable for the yet unreported profit. More recently this Court in *Harold W. Smith*, 56 T.C. 263 (1971), held that the petitioner's transfer of an installment obligation to his children, who thereupon placed the obligation in trust and paid petitioner an annuity, was in fact a disposition as conceded by the petitioner, and thereby subject to the provisions of section 453(d). However, petitioners raise several contentions which deserve consideration before our holding can be deemed final. They contend that since the sale and the creation of the trust transpired simultaneously, the transaction in substance was a sale consisting of a $20,000 downpayment and a lifetime remuneration of $6,000 per year. Secondly, that the language quoted above presenting the reasoning behind the enactment of section 453(d) has in this case not been violated since the terms of the installment sales contract postponed payment of the principal until after petitioners' death thereby preventing payment of any further tax on the gain. Finally, that the grantor trust provisions, particularly section 677, are controlling, thereby treating the petitioners as the owners of the trust and removing any possible section 453 application.

The petitioners' first contention has little or no justification in light of the fact that the form of the transaction was contemplated and carried out by the petitioners; it was their decision to report the sale on the installment basis. A taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form.

The second assertion also has little merit. Section 691(a)(4) holds that an installment obligation received by the decedent's estate is income in respect of a decedent.[7] Therefore, even though the petitioners in the present case would receive no additional principal while alive, thereby having to pay no additional tax, their estate or designated beneficiary would be obligated to report the gain on receipt of the

---

[7] SEC. 691(a). INCLUSION IN GROSS INCOME.—

(4) INSTALLMENT OBLIGATIONS ACQUIRED FROM DECEDENT.—In the case of an installment obligation received by a decedent on the sale or other disposition of property * * * if such obligation is acquired by the decedent's estate from the decedent * * *

(A) * * * shall * * * be considered as an item of gross income in respect of the decedent * * *

$120,000. If petitioners succeeded in transferring the installment obligation to the trust without reporting any gain, a substantial amount of tax would be avoided. As noted above, the prevention of such avoidance was the congressional motive behind section 453(d).

With their last contention petitioners seek to carry water on both shoulders. By claiming charitable deductions on their tax returns for the years in issue for a gift of an installment obligation in the face amount of $120,000, they represented that they had no further interest in said obligation. Yet they seek to avoid the income tax consequences of such a transfer as required by section 453(d) by claiming that the grantor trust provisions contained in sections 671-677 make them the technical owner of the installment obligation, and hence they never made a section 453(d) disposition. This, of course, cannot be—having claimed the tax benefit of a charitable contribution, petitioners are hoisted by their own petard and must accept the consequences.

Further this last contention begs the question to be decided. The fundamental issue relates to whether in fact the petitioners conveyed away their entire interest in the contract, taking back a life interest or, on the other hand, whether they merely conveyed the remainder or principal interest. We note that though the trust instrument required the payment of $6,000 per year to the petitioners this amount was identical to the remuneration the petitioners were to receive in the initial sales contract.[8] It is therefore manifest to this Court that though the form of the transaction may superficially bear a resemblance to a grantor trust, in substance the petitioners conveyed away their interest in the principal of the contract; which in fact was a complete disposition of that interest. The annual payment was nothing more than the pass-through by the trust of $6,000 per year in interest from the original purchasers, Wells & Wade Fruit Co., to the petitioners; the trust serving as a mere conduit. As the Supreme Court noted in *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938), "A given result at the end of a straight path is not made a different result because reached by following a devious path." Therefore, the transaction is controlled by the disposition provisions of section 453.

In the alternative if we conclude that the petitioners conveyed their entire interest taking back the right to an annual payment, this Court still must hold the grantor trust provisions inapplicable to the principal interest conveyed to the trust. The reasoning is twofold. First, it is clear that the principal interest conveyed by petitioners to the

---

[8] The trustee could at his discretion apply the trustee's fees against the $6,000 annual payment. However, no such application was required and the fee even if so applied was nominal to say the least.

trust was irrevocable. Section 673 treats a taxpayer as the owner of a trust corpus where at its inception the corpus may reasonably be expected to revert within 10 years. It is therefore evident that this provision can have no application to the present set of facts. Secondly, though the trust instrument stated that the petitioners were to receive $6,000 per year from income and if necessary from *principal*, thereby implying the application of section 677(a)(1) to both components of the contract, principal and income, such treatment is not called for. Recalling the language of the initial contract we note that the unpaid principal of $120,000 was not payable until the death of the petitioners. Therefore, it is obvious that the annual payment could only come from income and thus the term "principal" was superfluous.

Admittedly, there was a forfeiture provision in the sales contract in the event the purchaser failed to meet the provisions of sale. However, such a provision has no effect on an early principal payment and in addition the possibility of such a happening, due to the purchaser's strong financial position, was extremely remote. Thus, it was most appropriate in this case to hold that the grantor trust provisions are applicable, if at all, to the income interest alone, and therefore we necessarily conclude that the remainder interest was disposed of within the purview of section 453(d).[9] Such treatment is not novel in light of the language of sections 671–678 which hold in effect that a taxpayer may be treated as an owner of only a portion of a trust. To reach any other result would clearly frustrate the intent of Congress in enacting section 453(d).

Having determined the existence of a disposition it is necessary to ascertain the fair market value of the property disposed of. The respondent through his appraiser, Albert H. Keppler, valued the obligation at $80,000. This figure was based primarily on the life expectancy of the petitioners.

It is manifest from the peculiar nature of the underlying product and the terms of the contract itself that a valuation must be based on several other considerations, including the hazardous nature of the business; the extended period of time between planting the orchard and its bearing fruit; the underlying product being difficult if not impossible to insure; the fact that the type of security involved is not attractive to most investors and therefore the traditional purchaser must be eliminated; the private investor does not usually have the amount of financing required; and finally as noted above, the entire amount of principal is not payable until maturity of the contract which

---

[9] In light of this decision it is evident that Rev. Rul. 67–70, 1967–1 C.B. 106, is in accord with the result reached by this Court and the petitioners' reliance is therefore misplaced.

is dependent on the life expectancy of the petitioners. In light of the respondent's failure to consider these additional factors it is apparent that his valuation exceeds the reasonable fair market value of the installment obligation.

Richard A. Myers, appraiser on behalf of the petitioners, considering most of the factors enunciated above, valued the obligation at an absolute maximum figure of $75,000. This Court concludes that the installment obligation does in fact have an ascertainable value and, due to the many diverse factors noted above, that such fair market value is $75,000.

Upon an examination of the entire record we conclude that the petitioners have disposed of their installment obligation within the purview of section 453(d) and therefore must recognize gain to the extent of the difference between said fair market value and their basis in the obligation.

The second issue relates to the petitioners' right to (1) deduct the charitable contribution made to the A. Z. Wells Foundation to the extent of 30 percent of their adjusted gross income and (2) their right to carry over the additional contribution to succeeding years. The facts indicate that the determination rests solely on whether the foundation is considered publicly supported within the meaning of section 170(b)(1)(A).

In the Revenue Act of 1964 Congress expanded the charitable classification which entitles the contributor to deduct contributions to the extent of 30 percent of their adjusted gross income. In essence by adding subsection 170(b)(1)(A)(vi) Congress included an organization which receives a substantial part of its support from governmental units or from direct or indirect contributions from the general public.[10] It also added a provision permitting a taxpayer to carry over a contribution made to a "30 percent charity" if in fact the amount contributed exceeded 30 percent of the taxpayer's adjusted gross income.[11]

The respondent contends that since there were only four or five contributors and the interests contributed were remainder interests

[10] SEC. 170(b)(1)(A)(vi). an organization referred to in subsection (c)(2) which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under sec. 501(a)) from a governmental unit referred to in subsection (c)(1) or from direct or indirect contributions from the general public.

[11] SEC. 170(b)(5). Carryover of certain excess contributions by individuals.—

(A) In the case of an individual, if the amount of charitable contributions described in paragraph (1)(A) payment of which is made within a taxable year (hereinafter in this paragraph referred to as the "contribution year") beginning after December 31, 1963, exceeds 30 percent of the taxpayer's adjusted gross income for such year * * * such excess shall be treated as a charitable contribution described in paragraph (1)(A) paid in each of the 5 succeeding taxable years in order of time * * *

in trust the foundation was not publicly supported within the meaning of section 170(b)(1)(A). In support of this assertion respondent points to the language of the regulations which states:

However, under no circumstances will an organization which normally receives substantially all of its contributions (directly or indirectly) from the members of a single family or from a few individuals qualify as a "publicly supported" organization. [Sec. 1.170–2(b) (5) (iii) (c) (2).]

The petitioners on the other hand contend that in light of the fact that the total assets of the foundation equaled only $2 million and the interests conveyed had a present fair market value of approximately $600,000 this should qualify the foundation as publicly supported.

Though there are no cases on point the legislative history is most enlightening. It makes clear that the purpose behind the passage of the applicable provisions was the equalization of benefits available to charitable organizations supported by the public and the encouragement of immediate contributions by the populace to these organizations. Congress noted the following:

The additional 10-percent deduction is limited to organizations which are publicly or governmentally supported, however, and this additional deduction is not made available in the case of private foundations. * * * *The extra 10-percent deduction is intended to encourage immediately spendable receipts of contributions for charitable organizations.* [Emphasis supplied.]

\* \* \* \* \* \* \*

The reference to direct or indirect contributions from the general public prevents what are generally termed private foundations from qualifying for this additional 10-percent deduction. *To qualify, the organization must receive support from at least a representative number of persons within the community concerned.* [Emphasis supplied. S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 562–563.]

In light of the above discussion it seems apparent that the case at bar does not fit within the expanded provisions enacted by Congress. The purpose for enacting the statute was to encourage "immediately spendable receipts" by contributors; here, however, the contributions were future interests which for the most part would not be realized for several years. Equally important, the facts indicate, as noted above, that the only contributions made consisted of four or five remainder interests conveyed in trust to the foundation. Clearly, this is not a representative number of persons within the community. It is therefore evident that Congress was not so much concerned with the amount of contribution as it was with the number of contributors.

In light of all the facts and circumstances we hold that the A. Z. Wells Foundation is not publicly supported and therefore the petitioners are only entitled to deduct the charitable contributions to the

extent of 20 percent of adjusted gross income and are not therefore entitled to carry over the additional contribution.

The third issue relates to the existence of an annuity. Though this was conceded by respondent, the petitioners' reply to the amended answer seems once again to raise the question.

We concluded above that the $6,000 payment from the trust was in fact an interest payment from the purchaser, Wells & Wade Fruit Co., to the petitioners. Therefore, it could not be an annuity and must be included in income as an interest payment.

Finally, we must point out that though the notice of deficiency recomputed the tax for the fiscal year ended June 30, 1967, it did not assess additional tax. Therefore, since there was no deficiency the year is not within this Court's jurisdiction. *Milby & Dow Coal & Mining Co.*, 24 B.T.A. 40 (1931); *New York Trust Co., et al.*, 3 B.T.A. 583 (1926).

*Decision will be entered under Rule 50.*

Reviewed by the Court.