INTERNATIONAL TRADING CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4727–67. Filed December 28, 1971.

*Stanley P. Gimbel* and *A. L. Skolnik*, for the petitioner.
*Robert M. Burns*, for the respondent.

STERRETT, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes for the periods indicated:

| Taxable year ended | Amount |
| --- | --- |
| Aug. 31, 1959 | $48, 131. 57 |
| Aug. 31, 1960 | 98, 402. 86 |
| Aug. 31, 1963 | 4, 889. 29 |

Both petitioner and respondent have made concessions and there remains only one question to be determined by the Court. It must be decided whether petitioner is entitled to a capital loss carryover for its taxable years ended August 31, 1959 and 1960, under section 1212.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and documents attached thereto are incorporated herein by this reference.

International Trading Co. (hereinafter referred to as petitioner) is a Wisconsin corporation, and its principal place of business at the time of filing its petition herein was Milwaukee, Wis. When organized on April 25, 1944, petitioner was named the L.B.D. Investment Co., Inc. Its present name was assumed on December 7, 1945. During the years in issue, petitioner utilized the accrual method of accounting and computed its income and taxes on the basis of a fiscal year ended August 31. Federal corporation income tax returns for the taxable years ended August 31, 1959, 1960, and 1963, were filed by petitioner with the district director of internal revenue, Milwaukee, Wis.

Petitioner, in the years 1946, 1947, 1948, and 1949, was engaged in the purchase and sale of brewery supplies consisting principally of corrugated paper containers, bottles, and miscellaneous paper products and held real estate and collected rents. In the years 1950 and 1951, it

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless indicated otherwise.

was engaged in the brewery supply business and sale of containers on a commission basis, in warehousing, and held real estate and collected rents therefrom. In 1952, petitioner engaged in the brewery supply business, sold corrugated paper containers on a commission basis, and held real estate and collected rents therefrom. During the years 1953, 1954, and 1955, International Trading Co. was in the business of manufacturing partitions for brewery containers, collected rents, received interest income, and received commissions from sales of brewery supplies.

On August 31, 1944, petitioner acquired for $23,875.36 a 13-acre tract of land on Beaver Lake, Waukesha County, Wis. (hereinafter referred to as the Beaver Lake property). During the period of September 1944 through August 1949, petitioner expended a total of $409,863.29 for the construction of buildings, for the acquisition of furniture, fixtures, and equipment, and for various other improvements to the Beaver Lake property. Additional improvements at a cost of $47,611.98 were made during the fiscal years ended August 31, 1950, through August 31, 1952. The property included a large residence consisting of living room and dining room combination, three bedrooms, kitchen, bathroom, two washrooms, and porch; a small house consisting of two bedrooms, living room, kitchen, and bathroom; one apartment located over a boathouse, consisting of two bedrooms, living room, kitchen, breakfast room, and bath; one small dwelling house consisting of four bedrooms, two baths, kitchen, which had attached to it a community entertainment room with complete facilities for entertaining large groups, and a lower level having several dressing rooms with showers for guests and a restroom; a guesthouse capable of accommodating six people; a horse stable with caretaker's loft above; a boathouse; a rock garden; a play ground; a floodlighted tennis court; and a small screen house.

During the periods indicated petitioner received gross rental income in respect to the Beaver Lake property from the following sources:

| | 1948 | 1/1/49— 6/24/49 | 6/25/49— 8/31/49 | 9/1/49— 9/31/50 |
|---|---|---|---|---|
| Michael Shapiro | $3,600 | $1,800 | $600 | $3,600 |
| Jack La Kam | 1,200 | 600 | 200 | 1,200 |
| Ben Libowsky | 500 | 500 | 200 | 1,200 |
| Julius Rubin | 2,200 | 1,200 | 400 | 2,400 |
| American Partition Corp | 1,800 | 450 | | |
| International Oil Co | 600 | 300 | 100 | 600 |
| Cream City Trading Co | 1,600 | 1,200 | | |
| Cream City Container Corp | 800 | | | |
| | 12,300 | 6,050 | 1,500 | 9,000 |

The four companies named above were at least at one time related to the petitioner through common ownership.

Petitioner attempted to sell the Beaver Lake property in 1950 and also listed it for sale in the summer of 1951 at a price of $200,000. During 1951 petitioner received and rejected an offer of $105,000 for the property. The Beaver Lake property was sold by petitioner at public auction on June 22, 1957. The sale included all land and buildings and all the furniture, fixtures, and other equipment located on the property. The auction sale resulted in the division of the property into four parcels, two of which were purchased by Siepman Investment Co. and two of which were purchased by Ben Libowsky. As of the date of the sale petitioner's adjusted basis in the Beaver Lake property was $447,167.16. A total of $144,500 was realized on the sale thereby producing a loss of $302,667.16.

On its Federal corporation income tax return for the fiscal year ended August 31, 1957, petitioner claimed an ordinary loss on the sale of the Beaver Lake property. The claimed ordinary loss was disallowed by respondent in connection with an audit of petitioner's fiscal years ended August 31, 1956, and August 31, 1957. Petitioner did not realize any capital gains in its fiscal years ended August 31, 1957 and 1958. During its fiscal year ended August 31, 1959, petitioner realized capital gains in the amount of $118,582.60, but claimed no capital loss carryover from the Beaver Lake property sale. Capital gains in the amount of $165,096.56 were realized by petitioner in its fiscal year ended August 31, 1960. In its return for that year petitioner claimed an unused capital loss carryover of $227,602.09 from the Beaver Lake property sale. For its fiscal year ended August 31, 1961, petitioner reported capital gains of $126,678.87 and claimed the balance of the Beaver Lake property loss as an unused capital loss carryover.

In a statutory notice dated June 23, 1967, respondent asserted that petitioner had failed to establish the availability of any unused capital loss carryover for use in its fiscal years ended August 31, 1960 and 1961. Respondent, however, did not determine a deficiency in petitioner's taxes for the fiscal year 1961. A deficiency for fiscal year 1959 was determined on a basis other than the question of a capital loss carryover. Petitioner, in its petition, claimed the right to use $118,582.60 of the Beaver Lake property loss as a capital loss carryover for its fiscal year ended August 31, 1959, $165,096.56 of the loss as a carryover for the fiscal year 1960, and the balance of the loss as a carryover for fiscal year 1961.

OPINION

Petitioner, from 1944 to 1957, owned a piece of property fronting on Beaver Lake in Wisconsin. The property was sold at a loss in 1957. The sole issue for consideration is whether petitioner, as a result

# 458

of its loss on the Beaver Lake property, is entitled to a capital loss carryover under section 1212 [2] for its taxable years ended August 31, 1959 and 1960. An answer to this question requires that we determine whether petitioner's loss is deductible under section 165 (a).[3]

Preliminarily, we must dispose of one matter raised by the somewhat disorderly state of the pleadings. As noted in the Findings of Fact, petitioner claims the right to a carryover for its fiscal year ended August 31, 1961. Although respondent, in the statutory notice, did recompute petitioner's 1961 income for certain purposes, no deficiency with respect to that year was asserted. Absent a deficiency, this Court has no jurisdiction over petitioner's fiscal year 1961, and can make no determination on what is, in effect, petitioner's claim for overpayment. *A. W. Legg*, 57 T.C. 164, at 174 (1971); *New York Trust Co.*, 3 B.T.A. 583, 586 (1926).

Turning to the substantive issue respondent makes the claim that the Beaver Lake property was neither property used in petitioner's trade or business, nor property held for the production of income. In making this contention he calls our attention to our earlier opinion in *International Trading Co.*, T.C. Memo. 1958-104, affd. 275 F. 2d 578 (C.A. 7, 1960), wherein we determined that the Beaver Lake property, during petitioner's taxable years ended 1951 and 1952, was held primarily for the benefit of petitioner's stockholders who were all members of the same family, and that the property had little or no business use. Consequently, the claimed deductions for depreciation and maintenance expenses in those earlier years were disallowed. The Court of Appeals for the Seventh Circuit, in affirming the decision of this Court, said: [4]

[Since] the Beaver Lake property was maintained in the taxable years here in question primarily for the personal benefit of the stockholders, and that it had little or no business use, it follows that the claimed expenses under sec. 23 (a) (1) (A) [now section 162 (a)] *were not* ordinary and necessary expenses *incurred in carrying on the taxpayer's trade or business.* [275 F. 2d at 585.] [Emphasis supplied.]

---

[2] SEC. 1212 CAPITAL LOSS CARRYOVER.
   (a) CORPORATIONS.—
     (1) IN GENERAL.—If for any taxable year a corporation has a net capital loss, the amount thereof shall be a short-term capital loss—
       (A) in each of the 5 succeeding taxable years, or

\*      \*      \*      \*      \*      \*      \*

to the extent such amount exceeds the total of any net capital gains (determined without regard to this paragraph) of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year.
[3] SEC. 165. LOSSES:
   (a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
[4] In the face of the oral argument by petitioner's counsel that "there is no such thing as a nonbusiness activity of a corporation." 275 F. 2d at 583.

The only evidence in the current record which might indicate some business use of the Beaver Lake property *at any time* is an exhibit which reflects the receipt by petitioner of certain amounts for rent during the period 1948 through 1950. Most of the rent was paid by petitioner's stockholders, presumably for their own use of the property. Similar facts were present in *International Trading Co.*, *supra*, and, here as there, they avail the petitioner naught. The balance of the rent was paid by corporations related to petitioner through common ownership. Unfortunately petitioner presented no evidence with respect to its expenses in operating the Beaver Lake property during the period 1948 through 1950. Accordingly it cannot be determined if rental income exceeded expenses which, if it did, might mark the property as being held for some business purpose at least in those early years. As to other years during which petitioner held the property, the record is completely devoid of any evidence indicating a business or income-producing use for the property. Thus we hold that, for the entire period of time petitioner owned the Beaver Lake property, the property was not held by petitioner for use in its trade or business.

We are faced, therefore, with the specific narrow question of whether a corporation, having sold at a loss property which it owned but did not hold for use in its trade or business, may deduct such loss under section 165(a). The contention is made by petitioner that section 165(a) by its own terms allows the deduction of the loss here claimed. Petitioner compares the language of section 165(a), which states that "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.", with section 165(c) [5] which limits the loss deduction of individuals to losses incurred in trade or business, or in transactions entered into for profit, or to losses incurred by reason of casualty. The argument is that section 165(a), lacking the specific limitations set forth in section 165(c), perforce allows the deduction of any loss incurred by a corporation.

In determining whether to accept petitioner's literal interpretation of section 165(a), a brief analysis of its statutory ancestors proves helpful. A provision for the deduction of losses by corporations has long been a part of our Federal tax law. The Act of August 27, 1894,

---

[5] SEC. 165. LOSSES.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    (1) losses incurred in a trade or business;

    (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

    (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *

ch. 349, 28 Stat. 509, imposed a general income tax. As applied to corporations the Act provided in section 32:

That there shall be assessed, levied, and collected, * * *, a tax of two per centum annually on the *net profits or income above* actual operating and business expenses, including expenses for materials purchased for manufacture or bought for resale, *losses*, and interest on bonded and other indebtedness of all banks, [etc.] * * * and all other corporations, companies, or associations doing business for profit in the United States, no matter how created and organized, but not including partnerships. [Emphasis supplied.]

The context of the statute indicates that the losses referred to were conceived of as arising in the course of a corporation's business. After the 1894 income tax was declared unconstitutional [6] Congress took a different approach and in the Act of August 5, 1909, ch. 6, 36 Stat. 11, imposed upon corporations for profit an excise tax on the privilege of doing business, which excise was measured by the net income of the corporation. In computing net income, section 38 (second) of the 1909 Act allowed corporations a deduction for "all *losses* actually sustained within the year and not compensated for by insurance or otherwise, including a reasonable allowance for depreciation of property * * *." [Emphasis supplied.]

With ratification of the 16th amendment, Congress abandoned the excise on the privilege of doing business and, as part of the Act of October 3, 1913, ch. 16, 38 Stat. 114, enacted the first modern Federal income tax. Prior to approval of the 16th amendment, Congress in 1912 had under consideration a bill which would extend the excise on doing business to individuals. See H.R. 21214, 62d Cong., 2d Sess. The proposed excise had passed both Houses of Congress and was before the conference committee when the new grant of constitutional authority caused Congress to abandon the excise on doing business. The 1913 income tax was based on the structure of the 1912 bill and the 1909 corporate excise with the tax, however, being imposed, not on the privilege of doing business measured by net income, but rather directly on net income. The provision in the 1913 Act for the deduction of losses by corporations was identical to that in the 1909 Act. Ch. 16, sec. II G, 38 Stat. 114. In essential form this language remained constant up through the Internal Revenue Code of 1939. The Internal Revenue Code of 1954 gathered into section 165 all the 1939 Code provisions dealing with losses. The structural change was explained by the Finance Committee:

Rules for the treatment of losses contained in various subsections of section 23 of the 1939 Code have been brought together in this section.

The general rule for losses of individuals (sec. 23(e)) and the rule for corporations (sec. 23(f)) become subsections (a), and (c). The reference to the basis for determining the amount of any loss (sec. 23(i)) is now subsection (b). The treatment of wagering losses (sec. 23(h)) is contained in subsection

---

[6] *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U.S. 601 (1895).

(d). The reference to capital losses (sec. 23(g)(1)) is now subsection (f). No substantive change is made by this rearrangement. [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 198 (1954).]

This review of the statutory forebears of section 165(a) leads to the conclusion that it was simply assumed that losses by corporations would arise out of its trade or business.[7] Since such an assumption cannot be made with respect to losses suffered by an individual, the limitations set forth in section 165(c) are necessary and their absence from section 165(a) appropriate.[8]

Furthermore, we do not believe that strict construction requires a slavish unreasoning adherence to the literal reading of the statute. As the United States Supreme Court said in *United States* v. *Kirby*, 74 U.S. 482, 486 (1868):

All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.

The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit.

See also *Holy Trinity Church* v. *United States*, 143 U.S. 457 (1892).

The Supreme Court applied this established rule of statutory construction to a revenue act in *Helvering* v. *Owens*, 305 U.S. 468 (1939). There the Court limited the taxpayer's casualty loss on his personal automobile to the difference between its cost reduced by depreciation, which in fact had not been allowable by reason of the personal use of the automobile, and the value after the accident despite the fact that a literal reading of the statute seemed to allow a loss in the amount of the difference between cost and value after the casualty. The Court noted (p. 471) that the provision requiring an adjustment to basis on account of depreciation "must be read as a limitation upon the amount of the deduction so that it may not exceed cost."

An identical necessity exists for an integrated approach to the current Internal Revenue Code as is easily demonstrable by the case at bar. Thus, we note that in *International Trading Co., supra*, petitioner was denied a deduction under section 23(l) of the Internal Revenue Code of 1939 (now section 167(a))[9] for depreciation with respect to

[7] See Surrey & Warren, Federal Income Taxation 338; A. J. Parker, "Deductions and Credits," PLI 76 (1967).
[8] For a discussion of early statutory changes with respect to losses incurred by an individual see L.O. 968, 2 C.B. 212.
[9] Both sec. 23(l) of the 1939 Code and sec. 167(a) of the 1954 Code permit the deduction of a:
reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
(1) of property used in the trade or business, or
(2) of property held for the production of income.

improvements erected on the Beaver Lake property. Petitioner's basis in the property, accordingly, was not subject to reduction on account of depreciation. If petitioner were now allowed a deduction for the loss accruing on the sale of the property, the effect would be to give it the benefit of a substantial portion of the depreciation which hitherto had not been deductible. Thus the specific requirement that depreciation be limited to property used in a taxpayer's trade or business or held for the production of income would be in part frustrated.

We note, too, section 172 which allows a deduction for net operating loss carrybacks and carryovers. A net operating loss is defined in section 172(c) as "the excess of the deductions allowed by this chapter over the gross income." Depreciation would be included in the computation of a net operating loss. A nonbusiness asset such as the Beaver Lake property would not qualify for depreciation, and accordingly there would be no depreciation allowance to help generate a net operating loss for a corporation. To permit then a corporation a deduction for a loss realized on the sale of the nonbusiness asset would be substantially to allow it a benefit circumscribed by section 172.

Although not specifically applicable to the years before us, section 274 and its legislative history provides some insight in determining whether section 165(a) grants petitioner the loss deduction it claims. Under section 274(a) a taxpayer is not allowed a deduction with respect to an entertainment or recreational facility unless it can be established that the facility is directly related to the taxpayer's trade or business. Section 274(g) then provides:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(g) TREATMENT OF ENTERTAINMENT, ETC., TYPE FACILITY.—For purposes of this chapter, if deductions are disallowed under subsection (a) with respect to any portion of a facility, such portion shall be treated as an asset which is used for personal, living, and family purposes (and not as an asset used in the trade or business).

Congress was quite explicit in detailing the results it thought would be achieved under section 274(g):

*Treatment of entertainment, etc., type facility.*—* * * This subsection prescribes the treatment to be accorded facilities coming within the purview of subsection (a)(1)(B), for purposes of chapter 1 generally. To the extent that expenses and other items with respect to a facility are disallowed under subsection (a), that portion of the facility is to be accorded the *treatment provided under present law to an asset used exclusively for personal, living, and family purposes.* Thus, the portion of a facility so treated will not be subject to depreciation, and *losses incurred on the sale* of such portion *will not be deductible.* [S. Rep. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 707, 881. Emphasis supplied.]

Clearly this legislative history tells us that Congress did not think taxpayers, including corporations, had the right to deduct losses realized on the sale of nonbusiness entertainment or recreational facilities. The new provision did extend the law to disallow losses on property even though it may have been used partly, but not "primarily," for business purposes. However, there is no indication in the legislative history of section 274 that Congress thought it was altering the meaning of section 165(a). Indeed, as the committee report clearly states, section 274(g) contemplates that losses on the sale of a nonbusiness entertainment or recreational facility would be disallowed under "present law." Comments made by a subsequent Congress with respect to an earlier enacted statute, while certainly not controlling, can be considered in construing that statute. *Estate of Alexia DuPont Ortiz DeBie*, 56 T.C. 876, 892.

In sum, and as we said in *Elmer L. Reese, Jr.*, 45 T.C. 407, 416 (1966), "We cannot ascribe to Congress an intention to 'legislate eccentrically' in the absence of clear indication that it wanted to discriminate on the basis of such a fortuitous circumstance. *J. C. Penny Co.* v. *Commissioner*, 312 F. 2d 65, 68 (C.A. 2, 1962)." It follows that that we are confident that Congress never intended, in providing for the deduction of corporate losses under section 165(a), to include within its grace losses suffered on the sale of nonbusiness assets.

In *Richard R. Riss, Sr.*, 56 T.C. 388 (1971), this Court reached an opposite conclusion on what was a minor issue in that case. We have obviously reconsidered our position on this matter and will no longer follow *Richard R. Riss, Sr.* in this respect.

In accordance with the foregoing we conclude and hold that petitioner is not entitled to a capital loss carryover for its taxable years ended August 31, 1959 and 1960, with respect to the loss realized on the sale of the Beaver Lake property in 1957. Consequently and because of concessions,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

SIMPSON, *J.*, concurring: What is the responsibility of a court in construing a statute—should the court construe it literally, leaving to Congress to alter the results if it wishes to do so, or should the court go beyond the literal meaning of the words of the statute in an attempt to carry out the purpose of the legislation? That is the fundamental issue raised by this case. I applaud the conclusion of the majority, but I would like to add my own thoughts in support of it.

The approach of construing the statute literally and leaving to Congress the alteration of any undesired results ignores the basic

division of responsibilities in our constitutional system. Congress is constituted as a large body elected by the people and accountable to them from time to time. When it acts, it reflects the diverse views and interests of the multitudes of people in this country. It has innumerable and momentous decisions to make each session concerning matters of foreign policy, defense, regulation of trade, and economic policies. In these areas, it charts the general course to be followed by our Government.

In our system of government, the courts are given the responsibility of deciding cases in accordance with the law, including those principles set forth in the Constitution and the acts of Congress. In exercising that responsibility, we inevitably discover situations not contemplated by the draftsmen of the law. When we do find one of those situations, we should attempt to determine how Congress intended for it to be handled within the general policies adopted by the Congress, and if we can find the legislative purpose with reasonable certainty, we should assist in carrying out the purposes of the law by adopting such an interpretation of the statute. As stated by Mr. Justice Holmes, "The very office of construction is to work out, from what is expressly said and done, what would have been said with regard to events not definitely before the minds of the parties, if those events had been considered." Holmes, The Common Law 303 (1881).

To refuse to go beyond the literal meaning of the words ignores the concept which was perhaps expressed best by Judge Learned Hand when he wrote that "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create." *Helvering* v. *Gregory*, 69 F. 2d 809, 810–811 (C.A. 2, 1934), affd. 293 U.S. 465 (1935). Such a refusal makes it necessary for Congress to become involved in every detail of tax policy. In the area of the tax laws, Congress has already chosen to legislate with a great deal of particularity; nevertheless, it should not be burdened with the necessity of considering additional details of the law. Congress can and should expect us to assume a responsible role in this constitutional system of government of attempting to carry out the general policies decided upon by the Congress.

Everybody deplores the complexity of the tax laws, but if we make it necessary for Congress to write every rule in detail, then we contribute toward that complexity. If we blindly adopt a literal approach to the statute, then we force upon Congress the task of adding another provision to alter the unintended result adopted by us.

The cases are legion in which the courts have assumed the responsibility of attempting to carry out the purpose of the legislation, even

though it went beyond the words of the statute. In *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955), the Supreme Court held that the income which the corporation realized from trading in commodity futures should be treated as ordinary income, and not as long-term capital gains. The Court said at pages 51–52:

Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in * * * [present section 1221]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision * * * must not be so broadly applied as to defeat rather than further the purpose of Congress. * * *

Cf. *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35 (C.A. 4, 1965), affirming on this issue 42 T.C. 510 (1964) (relating to the definition of property in section 337). In *Higgins* v. *Smith*, 308 U.S. 473 (1940), the Supreme Court believed that alleged losses in sales between a 100-percent shareholder and his corporation should not be taken into consideration for tax purposes, even though a literal reading of the statute would have allowed them. Under the reorganization provisions, the courts have added to the statutory requirements the requirement that there must be a continuity of interest for a transaction to qualify as a reorganization. *LeTulle* v. *Scofield*, 308 U.S. 415 (1940); *Pinellas Ice Co.* v. *Commissioner*, 287 U.S. 462 (1933). Although the language of section 337 provides that (except in the case of certain properties) no gain is recognized to the corporation on a qualified transfer, the tax-benefit rule has been applied by the courts to require recognition of the gain on the sale of expensed items. *Spitalny* v. *United States*, 430 F. 2d 195 (C.A. 9, 1970); *Anders* v. *Commissioner*, 414 F. 2d 1283 (C.A. 10, 1969), reversing 48 T.C. 815 (1967), certiorari denied 396 U.S. 958 (1969).

This approach of assuming the responsibility of attempting to carry out the purpose of the legislation is, of course, applied without regard to whether the result benefits the Government or the taxpayer. For example, in *First Nat. Bank* v. *Commissioner*, 104 F. 2d 865 (C.A. 3, 1939), the taxpayer convinced the court that the words "substantially all of the assets" in the reorganization provisions meant substantially all of the business assets, and the court held that the transaction qualified as a tax-free reorganization. In *Estate of Robert Rodger Glen*, 45 T.C. 323 (1966), we found that when Congress provided that a relinquishment of marital rights should not be treated as consideration, the purpose of the provision was to apply to voluntary transfers, and not to arm's-length contracts; and for that reason, we did not apply the provision to an arm's-length arrangement, even though the statute contained no exception for such a transaction. Compare *United States* v. *Allen*, 293 F. 2d 916 (C.A. 10, 1961).

466

As a court, we must follow the results intended by Congress, even though at times those results may appear to be paradoxical. Thus, we recognized the existence of multiple trusts for tax purposes, even though it was argued that they undermined the effect of the graduated tax. *Estelle Morris Trusts*, 51 T.C. 20 (1968), affirmed per curiam 427 F. 2d 1361 (C.A. 9, 1970); see *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961). Also, there are occasions when we cannot ascertain the intention of the legislation, and on such occasions, we must leave the problem to Congress to resolve. See *S.F.H., Inc.*, 53 T.C. 28 (1969); see also *Commissioner* v. *Brown*, 380 U.S. 563 (1965).

Our touchstone is what was the purpose of the legislation. If we can ascertain that purpose, we are not without power to carry it out; indeed, it is our responsibility to do so. *Helvering* v. *Clifford*, 309 U.S. 331 (1940). It is not judicial legislation for us to fill in the gaps, so long as we are merely carrying out the legislative purpose.

Unfortunately, there is no precise objective method for learning the purpose of legislation; it calls for the exercise of judgment. In my judgment, I am convinced, for the reasons set forth in the majority opinion, that the purpose of section 165 is not to allow a corporation a deduction for a loss resulting from the sale of nonbusiness property. The failure of Congress to deal expressly with the matter over the years does not convince me that it intended to allow a deduction in this situation. In the early days of the tax laws, it was not recognized that a corporation would hold nonbusiness property, and although such a practice may have become more common in recent years, Congress has not undertaken to deal with the matter of whether corporate deductions under section 165 should be restricted to business losses. Compare S. Rept. No. 552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423, 490. Clearly, the silence of Congress does not indicate that it intended to allow a corporate deduction for nonbusiness losses.

DAWSON and HOYT, *JJ.*, agree with this concurring opinion.

---

DRENNEN, *J.*, dissenting: I disagree with the majority because I think the conclusion it reaches represents judicial legislating far beyond the scope of the authority of this or any other court. The language of section 165(a) is clear and puts no limitations on the losses that are deductible by corporations. As pointed out in Judge Tannenwald's dissenting opinion the juxtaposition of sections 23(e) and 23(f) in the 1939 Code points up even more clearly the statutory distinctions between losses allowable to individuals and losses allowable to corporations, and the legislative history of section 165 indicates that no substantive change was intended. Indeed when the provisions for deduct-

ing losses were rearranged in the 1954 Code it can hardly be argued that Congress was not aware of what it was doing in placing the limitation on the deductibility of losses by individuals only.

It has long been acknowledged that deductions are matters of legislative grace in the income tax laws. I do not believe it is the function of the courts to decide what the law should be or to even express an opinion thereon, unless the statutory law is unclear, which is not the case in this instance. If a change in this provision of the law is deemed to be desirable, I would leave it to Congress to make the change.

I would apply the present law as it reads and allow the deduction. ATKINS, FORRESTER, and IRWIN, *JJ.*, agree with this dissent.

---

TANNENWALD, *J.*, dissenting: The task of this Court is to apply the statute as we find it, and it cannot be gainsaid that its language, insofar as this case is concerned, is crystal clear. Section 165 is contained in part VI of subchapter B of chapter 1 of the Internal Revenue Code, which bears the heading, "ITEMIZED DEDUCTIONS FOR INDIVIDUALS AND CORPORATIONS." Subsection (a) of section 165 specifically sets forth as the general rule: "There shall be allowed as a deduction *any loss* sustained during the taxable year and not compensated for by insurance or otherwise." (Emphasis added.) Subsection (c) carves out certain limitations "In the case of an individual." [1]

The 1939 Code dealt separately with losses—in section 23(f) without limitation "In the case of a corporation" and in section 23(e) with limitations "In the case of an individual"—and the legislative history of section 165 clearly indicates that no substantive change was intended in this respect. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 198 (1954).

The "held for use in its trade or business" test adopted by the majority produces a myriad of problems. Apparently it does not mean that the property must *actually* be used in the trade or business in order to get a loss on the sale. Compare *Alamo Broadcasting Co.*, 15 T.C. 534 (1950), with *Nulex, Inc.*, 30 T.C. 769 (1958); Rev. Rul. 56-520, 1956-2 C.B. 170. But the line which will necessarily have to be drawn will be murky and the test produces difficulty in the case of shared facilities provided on a cost basis. See S. Rept. No. 91-552, 91st Cong., 1st Sess., p. 104 (1969), relating to the enactment of section 213 [2] of the Tax Reform Act of 1969, which disallows deductions

---

[1] Sec. 165 is not the only section in part VI where distinctions are drawn between corporations and individuals. See sec. 165(i), 166(d), 166(f), 170(b)(1) and (2), 170(d)(1) and (2), 171(a)(3), 172(d)(5), and 176. See also sec. 163(d), added by the Tax Reform Act of 1969.

[2] Sec. 183, I.R.C. 1954.

where an activity is not engaged in for profit only in the limited situations "of an activity engaged in by an individual or an electing small business corporation." Compare also *Adirondack League Club*, 55 T.C. 796 (1971), on appeal (C.A. 2, May 24, 1971). Along the same lines, if the Beaver Lake property had been destroyed by fire or other casualty, the absolute rule articulated by the majority opinion would deny any loss to petitioner. Thus, petitioner would be in a worse position than the individual shareholders would have been if they had owned the property directly. This result would obtain despite the fact that section 165(c), which allows such loss to the individuals, is clearly a *limitation* on section 165(a).

That petitioner may not have been entitled to deduct expenses in respect of the Beaver Lake property is not a critical consideration. The rights to deductions under sections 162 and 212, on the one hand, and section 165, on the other, are not coextensive. See, e.g., *Warner* v. *Commissioner*, 167 F. 2d 633 (C.A. 2, 1948), affirming per curiam a Memorandum Opinion of this Court; *E. R. Fenimore Johnson*, 19 T.C. 93, 98 (1952); *William C. Horrmann*, 17 T.C. 903, 909 (1951).

*Helvering* v. *Owens*, 305 U.S. 468 (1939), upon which the majority relies, does not demand that we rewrite section 165(a). In essence, that decision stands for the proposition that the measure of a loss is to be geared to the economic realities of the situation and is not to be measured by a theoretical computation. The underlying basis of *Owens* could enable us to limit the loss of petitioner herein to the difference between the proceeds of sale and the original cost less depreciation, albeit nondeductible depreciation. *Indeed*, Owens might even be applied to limit the loss to the difference between the proceeds of sale and the fair market value of the property on the date of sale. Compare *Frank A. Newcombe*, 54 T.C. 1298 (1970). Compare also section 1.165–7, Income Tax Regs., dealing with the measure of casualty losses by individuals. But compare *Nulex, Inc.*, *supra*. Such an approach could result in a denial of the loss in its entirety on the ground that the sale price is proof of such fair market value. But respondent has advanced no arguments along the foregoing lines and the record herein is insufficient for us to reach a decision on any such basis.

Whether we think that Congress, if it had considered the problem involved herein, would have dealt with it in another manner is of no consequence. Compare, e.g., *United States* v. *Hendler*, 303 U.S. 564 (1938), which was followed immediately by the enactment of what is now section 357, dealing with the assumption of liabilities by a corporation upon a transfer of property to it upon incorporation; *Commissioner* v. *Gracey*, 159 F. 2d 324 (C.A. 5, 1947), affirming 5 T.C. 296 (1945), now overruled by section 1223(1), in regard to the tacking

of holding periods where noncapital assets are exchanged for capital assets; and *Wissing* v. *Commissioner*, 441 F. 2d 533 (C.A. 6, 1971), affirming in part 54 T.C. 1428 (1970),[3] dealing with the liability of a wife on a joint return in respect of unreported income of the husband, now modified by an amendment to section 6013 (e).

On the record herein, I conclude that petitioner should be entitled to a capital loss on the sale of the Beaver Lake property. *Richard R. Riss, Sr.*, 56 T.C. 388 (1971); cf. *Nulex, Inc., supra*. Compare also *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962).

FORRESTER, FAY, and IRWIN, *JJ.*, agree with this dissent.

---

[3] See also *Huelsman* v. *Commissioner*, 416 F. 2d 477 (C.A. 6, 1969), remanding T.C. Memo, 1968–95.

