FRIENDLY FINANCE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Friendly Finance, Inc. v. Commissioner
Docket No. 3940-87
United States Tax Court
T.C. Memo 1991-551; 1991 Tax Ct. Memo LEXIS 599; 62 T.C.M. (CCH) 1164; T.C.M. (RIA) 91551; November 5, 1991, Filed *599 Decision will be entered under Rule 155. Linda S. Paine and Robert I. White, for the petitioner. Melanie R. Urban, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION In his notice of deficiency, respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Fiscal Year
Additions to Tax, Sections
Ended
Deficiency
6653(a)(1) [1]
6653(a)(2)
6661(a)
June 30, 1983
$ 315,592.84
$ 15,779.64
*
$ 31,559.28
June 30, 1984
73,504.34
3,675.22
*
7,350.43
The above tax deficiencies include respondent's determination that petitioner is liable for personal holding company tax for each of the years in issue in the amount of $ 172,439.97 and $ 51,625, respectively. In his answer *600 to the petition, respondent claims additions to tax under section 6661(a) in the amount of $ 78,898.21 for fiscal year 1983, and $ 18,376.09 for fiscal year 1984, rather than the lower amounts determined in the notice of deficiency, set forth above. He claims the higher amounts under section 8002 of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, which increased the percentage rate for additions under section 6661(a) from 10 to 25 percent of the underpayment in the case of returns due after December 31, 1982. This increase is effective for additions assessed after October 21, 1986. The issues presented for decision are: (1) Whether certain payments constitute compensation for services rendered or dividends; (2) whether petitioner or one of its shareholders owned certain partnership units in the San Antonio Spurs Basketball Club at the time the partnership made a distribution of $ 200,000 to its partners, or at the time the partnership units were sold; (3) whether petitioner qualifies as a "lending or finance company" within the meaning of section 542(c)(6) for both of the years at issue, and, accordingly, is not a personal holding company subject *601 to personal holding company tax; (4) whether petitioner is liable for additions to tax for negligence under section 6653(a)(1) and (2); and (5) whether petitioner is liable for additions to tax under section 6661 for substantial understatement of income tax. We note that petitioner concedes the bad debt adjustments in the amount of $ 78,033.61 for fiscal year 1983, and $ 15,000 for fiscal year 1984, which were also determined by respondent in his notice of deficiency. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Background
Petitioner is a corporation organized in 1969 under the laws of the State of Texas. At the time the petition in this case was filed on its behalf, its principal place of business was Corpus Christi, Texas. In 1969, Mr. Charles F. Thomas, Mr. B. J. McCombs, and Mr. Jack Sulephen owned an automobile dealership, Charlie Thomas Courtesy Ford (Courtesy Ford), located in Corpus Christi, Texas. Customers of Courtesy Ford with good credit histories were able to obtain car loans from the Ford Motor Credit Company or banks, but customers with poor credit *602 histories and customers who wished to purchase older cars had difficulty obtaining financing. Mr. Thomas and Mr. McCombs organized petitioner to provide financing for car purchases by customers of Courtesy Ford who were unable to obtain conventional financing. After petitioner was organized, its operations grew and it later began financing the purchase of new cars, leasing cars, and selling credit insurance on the lives of its borrowers. Throughout the period in issue, most of petitioner's assets took the form of accounts receivable which were to be collected over the lives of the car loans it made. Petitioner required bank loans to conduct its operations and at its peak, its bank loans amounted to approximately $ 4.5 million. For the years in issue, petitioner accounted for and reported Federal income tax on the basis of a fiscal year ending June 30. Petitioner reported the following retained earnings on the balance sheets, Schedules L, filed as part of its Federal income tax returns for the fiscal years shown below: Fiscal Year
Retained Earnings
1980
$ 305,631.19
1981
321,053.43
1982
407,934.13
1983
429,198.36
1984
479,252.42
Initially, after petitioner was *603 organized by Mr. Thomas and Mr. McCombs, one half of its stock was issued to Mr. Thomas and the other half was issued to Mr. Sidney A. Sparks, who held the stock as "custodian" for Mr. McCombs' three daughters, Linda, Marsha, and Connie. Approximately 11 years later, in August of 1981, Mr. Gary V. Woods replaced Mr. Sparks as custodian for Mr. McCombs' daughters. Three days later, on August 15, 1981, their stock interest was transferred to a Texas general partnership, LYMARCO, in which each of the three daughters owned a one-third interest. As of June 30, 1982, 1983, and 1984, the shares of petitioner's stock were owned as follows: As of
As of
As of
Shareholder
June 30, 1982
June 30, 1983
June 30, 1984
Mr. Thomas
27,500
27,500 ** 47,500
Mr. Daniell
25,000
25,000
25,000
Mr. Sulephen
20,000
20,000 ** --
LYMARCO
27,500
* --
--
Total Shares
100,000
72,500
72,500
*604 During both of the years at issue, petitioner's board of directors consisted of Mr. Thomas, Mr. McCombs, and Mr. Daniell. Payments to Shareholders
Mr. Thomas was petitioner's principal manager from the time he cofounded it until June 30, 1984. He held the position of chairman of the board during the years in issue. During that time, he played a significant role in all major decisions affecting petitioner's growth and the types of business in which it engaged. Mr. McCombs was petitioner's other cofounder and was a member of petitioner's board of directors during the years at issue. In addition to his investment in petitioner, he was involved in other business ventures with Mr. Thomas, including Courtesy Ford and Courtesy Insurance Agency. He was also involved in business ventures unrelated to Mr. Thomas. All of Mr. McCombs' businesses and holdings were managed by McCombs Enterprises. During the years in issue, Mr. Gary V. Woods was president of McCombs Enterprises. He was also managing agent of LYMARCO. The record does not reveal when Mr. Woods became associated with McCombs Enterprises or LYMARCO. In the course of representing the McCombs family, Mr. Woods assisted *605 petitioner and consulted with its employees. He was not an officer or director of petitioner nor was he employed by it. Mr. Sulephen was a co-owner and manager of Courtesy Ford. He was neither an officer or director of petitioner nor was he employed by it. Nevertheless, the bulk of petitioner's business was derived from his referrals of Courtesy Ford's customers to petitioner and, under his management, Courtesy Ford agreed to repurchase any automobile which petitioner repossessed, if the customer was delinquent by 90 days or less. He also made sure that, when possible, petitioner's sales force sold credit life insurance to customers. Mr. Taylor Daniell became petitioner's general manager in 1973. He was a full-time salaried employee of petitioner until November 1978, when he moved to Houston to work for another business owned by Mr. Thomas and Mr. McCombs, Courtesy Insurance Agency. Mr. Daniell continued to work for petitioner without compensation on a part-time basis. During the years in issue, he served as petitioner's president and as a member of its board of directors. Prior to August of 1982, Mr. Thomas, Mr. McCombs, Mr. Sulephen, and Mr. Woods had received no dividends *606 or compensation from petitioner. Mr. Daniell had received compensation during the years 1973 to 1978 as a salaried employee of petitioner, but he had not received any dividends. In 1982, petitioner's directors and officers decided that petitioner's operations should be reduced in size with a view to the company's possible future liquidation. As steps were taken to carry out that decision and to contract petitioner's operations, cash became available to the business. In August of 1982, Mr. Thomas asked Mr. Daniell to determine if petitioner had enough cash on hand to distribute to certain individuals. Mr. Daniell determined that $ 100,000 was available. In deciding how much of the $ 100,000 to pay and to whom it should be paid, Mr. Thomas did not take into account the time and effort which any person had expended on behalf of petitioner. He allocated the payment to each of petitioner's four shareholders in accordance with the pro rata share which each of them held in petitioner's stock. Thus, at Mr. Thomas' direction, petitioner made the following payments on August 31, 1982: Amount of
Recipient
Payment
Mr. Thomas
$ 27,500
Mr. Daniell
25,000
Mr. Sulephen
20,000
LYMARCO
27,500
$ 100,000
*607 The above payments were made at or near the time that LYMARCO's stock in petitioner was redeemed. The redemption of LYMARCO's stock is described in more detail below. For financial statement purposes, petitioner initially booked the above payments as debits to an account entitled "Accts Receivable-officers & owners." At the end of fiscal year 1983, they were reclassified on petitioner's books as "management fees." Mr. Daniell decided to book the payments initially as loans. He was concerned that treating the full payment as compensation in a single month and, thereby, causing the monthly operating statement to show a loss would alarm petitioner's creditors. He was also concerned by the fact that recording the total amount as an expense would delay payment of a monthly bonus to petitioner's office manager. For income tax purposes, Mr. Thomas reported the portion of the $ 100,000 payment which he received from petitioner as a dividend on his 1982 individual Federal income tax return (Form 1040). LYMARCO also recorded its portion of the payment on its books as a dividend and reported it as a dividend on its U.S. Partnership Return of Income (Form 1065) for 1982. Mr. Daniell reported *608 his portion of the payment as business compensation on Schedule C of his 1982 Federal income tax return (Form 1040). The record does not reveal how Mr. Sulephen treated the portion of the payment which he received for tax purposes. During the following year, fiscal year 1984, petitioner made the following payments: Date
Mr. Thomas
Mr. Daniell
Ms. Overstreet
1/31/84
--
$ 10,000
--
2/29/84
--
35,000
--
3/30/84
--
1,000
--
5/31/84
$ 37,700
2,275
--
6/29/84
--
2,275
$ 2,000
$ 37,700
$ 50,550
$ 2,000
At the time these payments were made, Mr. Thomas and Mr. Daniell were petitioner's only shareholders. Ms. Overstreet was petitioner's secretary and treasurer. Initially, petitioner booked the payments made to Mr. Daniell on January 31, February 29, and March 30, 1984, as debits to an account entitled "A/R-Loan to Owners & Officers." At the end of the fiscal year, these payments were reclassified as management fee expenses. These payments were initially booked as loans for the same reasons the fiscal 1983 payments were initially booked as loans. The payments made to Mr. Daniell on May 31 and June 29, 1984, and the payments to Mr. Thomas and Ms. Overstreet *609 were booked initially as management fee expense. Ownership of San Antonio Spurs Partnership Interests
In 1976, petitioner purchased 37.9367 units of the Spurs Professional Basketball Club, Limited (the Spurs units), a limited partnership which owned the National Basketball Association (NBA) franchise for San Antonio, Texas. Petitioner paid $ 170,000 for the Spurs units. Approximately 10 percent of this amount was paid in cash and the balance was paid in the form of a promissory note. By 1982, petitioner had paid the promissory note in full. In 1979, the Spurs organization mailed to holders of Spurs units an offer to subscribe to additional units in proportion to each partner's interest in the Club. Petitioner was given the option of purchasing 39 additional units for $ 2,500 per unit, or a total purchase price of $ 97,500. Petitioner's board of directors decided not to purchase any additional Spurs units. However, Mr. Thomas was interested in purchasing the additional units for himself. He proposed to petitioner's board that he purchase the units through petitioner, and personally assume any obligations resulting from the purchase. The board accepted his proposal and *610 adopted a resolution dated September 24, 1979, which provided: BE IT RESOLVED, that the Company subscribe to its share of units (39 units) in the Spurs Professional Basketball Club, Ltd. Private Placement as more fully described in the Private Placement Memorandum dated September 12, 1979. Be it further resolved, that the ownership interest in and the obligation for said investment shall be assigned to Charles F. Thomas, and be it further resolved that the officers of the Company are authorized to execute whatever documentation may be required to fulfill the intent and consummation of this resolution.
Petitioner returned a transmittal letter, a subscription agreement, and a promissory note to the Spurs, binding itself to purchase the additional units offered. Mr. McCombs signed each of the documents on behalf of petitioner. The promissory note was payable to the Spurs in the principal amount of $ 97,500. It bore interest on the unpaid principal from October 1, 1979, at 6 percent per annum, but the first of four annual payments was not due until December 15, 1982. Payment of the note was secured by a security interest in the Spurs units. The subscription agreement provides *611 that petitioner's rights thereunder are nontransferable. On the same day that petitioner's board adopted the above resolution, September 24, 1979, it assigned its interest in the subscription agreement and promissory note to Mr. Thomas, subject to "presently outstanding obligations." Mr. Thomas executed an "Installment Promissory Note" payable to petitioner for $ 97,500, with the same terms as petitioner's promissory note to the Spurs. Petitioner booked the above transaction in its general ledger as a debit in the amount of $ 97,500 to an account entitled "A/R-Charlie Thomas for Spurs" and as a credit in the same amount to a loan account entitled "Note Payable-Spurs." It never booked the 39 additional Spurs units as an asset. On March 19, 1982, petitioner executed a "Replacement Installment Promissory Note" payable to the Spurs, in the principal amount of $ 3,852.68. The terms of this note were similar to the promissory note described above. This transaction was booked by petitioner as a debit of $ 3,852.68 to the "A/R-Charlie Thomas for Spurs" account and as a credit in the same amount to the "Notes Payable-Spurs" account. Petitioner did not report the payable to the Spurs *612 in the aggregate amount of the two notes, $ 101,352.68, nor did it report the offsetting receivable from Mr. Thomas on the balance sheet, Schedule L, of its Federal income tax return (Form 1120) for the fiscal year 1983. As a result of the above transactions, Mr. Thomas became the owner of the 39 additional Spurs units. Thus, by the summer of 1982, Mr. Thomas owned 27.5 percent of petitioner's stock and thereby owned an interest in the 37.9367 Spurs units owned by petitioner. He also owned the 39 additional Spurs units which were held in petitioner's name. Mr. Thomas' interest in the Spurs organization was small by comparison to the interest which Mr. McCombs owned in the Spurs organization through his wife and three daughters. They owned 160.6935 Spurs units, 24.5 units of San Antonio Basketball, Ltd., another limited partnership which formed a part of the Spurs organization, and 2,367,402 shares of Concessions, Inc., a corporation which was the general partner of the Spurs. Mr. McCombs' daughters also owned 27.5 percent of petitioner's stock and thereby owned an interest in the 37.9367 Spurs units owned by petitioner. In sum, the McCombs Family owned approximately 20 percent *613 of the Spurs organization. Mr. McCombs had been one of the founders of the Spurs in 1973, and he was a member of the board of directors of Concessions, Inc., the corporate partner. In the summer of 1982, Mr. Thomas entered into negotiations to acquire the Houston Rockets NBA franchise and in June of 1982, he signed an agreement to purchase the franchise. At the same time, Mr. McCombs also entered into negotiations to acquire another NBA franchise, the Denver Nuggets. In June of 1982, Mr. McCombs signed a commitment to purchase the Nuggets in a transaction set to close in mid-July. Both men were confronted by the fact that the NBA prohibits a person from owning an interest in more than one basketball franchise, directly or indirectly. Mr. McCombs attempted to avoid the NBA rule by proposing to place his family's interests in the Spurs in a blind trust, but the NBA rejected the proposal. In July of 1982, Mr. McCombs and Mr. Woods met with Mr. Angelo Drossos, the president of Concessions, Inc., to discuss the sale of the Spurs interests held by petitioner and the McCombs family. Mr. McCombs was well acquainted with Mr. Drossos, who was the president of Concessions, Inc., and *614 the Chairman of its board of directors. Mr. Drossos agreed to purchase the ownership interests in the Spurs which were held in the names of petitioner and the McCombs family for $ 3 million. Mr. Drossos stipulated that any other Spurs partner who wished to do so would be given the right to purchase a pro rata portion of each interest sold by the McCombs group. The transfer of the Denver franchise to Mr. McCombs was considered on July 8 and 12, 1982, by a committee of the NBA board of governors appointed for that purpose. The committee approved the transfer and, in a telex dated July 12, 1982, asked the NBA board of governors to vote on a resolution authorizing the proposed transfer of the Denver franchise to Mr. McCombs. The telex describes Mr. McCombs' agreement to sell "his 21.8 [sic] percent interest" in the Spurs on a pro rata basis to all existing San Antonio owners and Mr. Drossos' agreement "to purchase any portion of Mr. McCombs' interest which is declined by other current San Antonio owners." The NBA board of governors approved the resolution and the NBA's general counsel notified Mr. Drossos of that fact in a telex dated July 14, 1982. As approved, the resolution authorizing *615 the transfer of the Denver franchise to Mr. McCombs was subject to three conditions, one of which was the following: Mr. McCombs' divestiture, within thirty (30) days, of his ownership interest in the San Antonio franchise, which divestiture and the resultant transferees remain subject to the approvals required by the NBA constitution.
Mr. McCombs closed his purchase of the Denver Nuggets on July 16, 1982. On July 23, 1982, Mr. Drossos announced the sale of the interests of the McCombs group in the Spurs at a board meeting of Concessions, Inc. The minutes of the board of directors refers to this matter as follows: President Drossos then reviewed the status of the sale of the McCombs interest in the Spurs. The transaction must be completed by 8-31-82, and Drossos advised that he would buy the portion that was not purchased by the other SPBCL investors. A motion was made and passed that SPBCL, Concessions, and SABL refused to exercise rights to purchase the McCombs interest. This action then made the McCombs interest available to the investors in SPBCL.
It is not clear why the deadline for divesting the McCombs family interest in the Spurs was August 31, 1982, *616 as stated in the above minutes, rather than August 15, 1982, 30 days from the date Mr. McCombs purchased the Denver Nuggets, July 16, 1982. On the same day as the above board meeting, July 23, 1982, Colonel Maury Holden, the secretary-treasurer of the Spurs, mailed two letters to each Spurs investor. The letters notified owners of interests in the Spurs organization of the fact that Mr. McCombs had decided to purchase the Denver Nuggets and that all members of his family were required to dispose of their interest in the Spurs. The letters also stated that Mr. Angelo Drossos had agreed to purchase the McCombs' interests for $ 3,000,000 and offered existing Spurs investors the opportunity to participate in the purchase. A document entitled "MEMO: Details of McCombs Sale," bearing the date August 16, 1982, and Colonel Holden's signature, itemizes the interests in the Spurs to be sold by the McCombs group and the price to be paid as follows: Ownership Name
Entity
Unit Price
Amount Due
Charline McCombs
24.5 Units SABL
$ 3,856.16
$ 94,475.92
Connie M. McNab
789,134 Sh Conces.
$ 0.6794158
$ 828,525.03
53.5645 Units SPBCL
$ 5458.37
Lynda M. Rubey
53.5645 Units SPBCL
$ 5458.37
828,525.03
Marsha M. Shields
53.5645 Units SPBCL
$ 5458.37
828,525.03
Friendly Finance
76.937 [sic] Units
$ 5,458.37
419,948.99
SPBCL
Total
$ 3,000,000.00
*617 It is clear that all 76.9367 Spurs units standing in petitioner's name were included among the interests to be sold to Mr. Drossos or other Spurs partners. Three investors in the Spurs organization responded to the letters mailed by Colonel Holden and expressed a desire to participate in the purchase of the above interests in the Spurs. Two of them, Mr. Roger L. Zeller and Mr. Logan P. Huntress, ultimately joined in the purchase. There were various ways for Messrs. Zeller and Huntress to participate with Mr. Drossos in the purchase of the interests of the McCombs group in the Spurs. As finally structured, they both agreed to accept Spurs units owned in petitioner's name and to make cash payments in the following amounts: Mr. Roger L. Zeller
15.77 units
$ 86,078.49
Mr. Logan P. Huntress
12.90 units
70,412.97
Total
28.67 units
$ 156,491.46
The above cash payments were based upon a price per unit of $ 5,458.37, the amount stipulated in Colonel Holden's memorandum of August 16, 1982, quoted above. Despite the 30-day deadline imposed by the NBA for the McCombs family to divest themselves of their interests in the Spurs, the board of directors of Concessions, Inc. *618 did not release the lien on the Spurs units purchased by Messrs. Zeller and Huntress until September 24, 1982. After that was done, Messrs. Zeller and Huntress each accepted petitioner's assignment of the Spurs units which he had agreed to purchase. The assignments executed on petitioner's behalf on September 23, 1982, make clear that the units were subject to: the security interest therein * * * to secure the payment of certain promissory notes executed by the Assignor [petitioner] and payable to the order of the Partnership in the aggregate principal sum of $ 101,352.68, which promissory notes have this date been assumed by Angelo Drossos.
Mr. Drossos gave both Mr. Zeller and Mr. Huntress a letter dated September 28, 1982, stating that he had assumed petitioner's obligations under the two notes and further agreeing to indemnify and hold each of them harmless from loss or damage sustained "by reason of the existence of any security interest granted by Friendly Finance to the Partnership to secure the payment of the promissory notes referred to above." Messrs. Zeller and Huntress executed assumption agreements "effective as of August 31, 1982," but Mr. Zeller made his *619 payment in a check which was dated September 28, 1982, and Mr. Huntress' check was dated October 1, 1982. Both checks were made payable to petitioner but they were both deposited into an account at the First City Bank maintained in the name of "Gary V. Woods, Nominee." To effectuate Mr. Drossos' agreement to purchase the interests of the McCombs group in the Spurs organization which were not purchased by other Spurs partners, Mr. Drossos and his wife issued a promissory note dated September 1, 1982, to Mr. McCombs' wife, his three daughters, and petitioner. The promissory note was in the principal amount of $ 2,843,509.97 (i.e., $ 3,000,000, less the aggregate amount paid by Messrs. Zeller and Huntress, $ 156,491.46, plus a small difference probably due to rounding, $ 1.43). The note bore interest at 10 percent per year and required full payment of principal and interest on or before September 1, 1983, one year later. Payment of the note was secured by a "Security Agreement." By the terms of the security agreement, the interests of Mr. McCombs' wife, his daughters, and petitioner in the Spurs organization, other than the partnership units sold to Messrs. Zeller and Huntress, *620 were transferred to a trustee who was authorized to sell them, in the event of default, and to apply the proceeds of the sale to the note. The trustee was to deliver any remaining Spurs units to Mr. Drossos only after the note was paid in full. On September 1, 1982, Mr. and Mrs. Drossos entered into a "Supplemental Agreement" with Mrs. B. J. McCombs, her three daughters, and petitioner. Mr. Woods executed the agreement on petitioner's behalf. In the supplemental agreement, each member of the McCombs group agrees to sell his or its interests in the Spurs to Mr. Drossos for the promissory note in the amount of $ 2,843,509.97, described above. The supplemental agreement states that title to the interests of the McCombs group in the Spurs is to be transferred to Mr. Drossos and the promissory note is to be secured by the security agreement described above. It further states that Mr. Drossos is to have all the rights of a shareholder or partner in the Spurs, except that the McCombs group are to receive all the benefits of ownership of the interests, including distributions of cash and stock, such distributions to be applied first to the accrued interest and then to the principal on *621 the promissory note. The supplemental agreement contains other provisions, however, which fundamentally alter the nature of the transaction. First, the McCombs group agree that the 1-year maturity date of the promissory note is "automatically extended" for an additional year and, unless Mr. Drossos notifies them to the contrary, similar automatic 1-year extensions are to continue until September 1, 1992. Second, unpaid interest on the note at the time of each annual extension is to be forgiven and Mr. Drossos' obligation to pay the interest "forever discharged." Third, the McCombs group agree to remain liable for all previously existing obligations to the Spurs, including petitioner's notes in the original principal amounts of $ 97,500 and $ 3,852.68. Fourth, the McCombs group are given "a continuing option to repurchase" all of their Spurs interests from Mr. Drossos by canceling the note at any time during its term, including extensions. Fifth, Mr. Drossos agrees not to transfer any of the Spurs interests to anyone other than the McCombs group without first giving them 30 days' notice, during which time they can repurchase any part of the interests offered for sale. After the *622 transactions with Mr. Drossos, Mr. Zeller, and Mr. Huntress were completed, the accountant for McCombs Enterprises, Mr. James Steger, prepared a schedule to allocate the sales proceeds among the owners of the Spurs interests which were sold. The schedule reflects no allocation to LYMARCO, but allocates sales proceeds to petitioner and Mr. Thomas based upon their ownership of 37.9367 and 39 Spurs units, respectively. At some time which is not disclosed by the record, LYMARCO and petitioner entered into an "exchange agreement." The agreement was to be effective August 31, 1982, and provided, in pertinent part, as follows: Whereas, the parties hereto presently own the following: LYMARCO: 27,500 shares of the common capital stock of Friendly Finance, Inc.
FRIENDLY FINANCE, INC.: Rights, title, and interest in the proceeds of 37.9367 units of Spurs Basketball Club, Ltd., presently held by Angelo Drossos. 1. Exchange. Subject to the terms of the Agreement, LYMARCO irrevocably offers to FRIENDLY FINANCE 27,500 shares of the common capital stock of Friendly Finance, Inc., such being 27.5% of the outstanding common shares of Friendly Finance, Inc., in exchange for all rights, *623 title, and interest in the proceeds of 37.9367 units of Spurs Professional Basketball Club, Ltd. Subject to the terms of this Agreement, FRIENDLY FINANCE irrevocably offers to LYMARCO all rights, title, and interest in the proceeds of 37.9367 units of Spurs Professional Basketball Club, Ltd., in exchange for 27,500 shares of the common capital stock of Friendly Finance, Inc.
2. Consideration for Exchange. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, LYMARCO and FRIENDLY FINANCE agree to an exchange of LYMARCO's 27,500 shares of Friendly Finance, Inc. common capital stock for FRIENDLY FINANCE's rights, title, and interest in the proceeds of 37.9367 units of Spurs Professional Basketball Club, Ltd. Subject to the terms of this Agreement, this trade shall be considered an even and equitable exchange. [Emphasis supplied.]
For Federal income tax purposes, petitioner did not report any gain from its redemption of LYMARCO's stock under the above exchange agreement nor did it report any gain from the sales of Spurs units to Mr. Drossos, Mr. Zeller, or Mr. Huntress. Petitioner's accountant took the position that *624 the redemption of LYMARCO's stock was a distribution covered by the nonrecognition rules set forth in section 311 and he relied on the fact that LYMARCO, and not petitioner, received the cash proceeds of the sales of Spurs units to Messrs. Zeller and Huntress. Similarly, LYMARCO did not report any of the sales of Spurs units on its partnership return nor did it report any gain or loss from the redemption of its stock in petitioner. The partners of LYMARCO, Mr. McCombs' daughters, did not report the gain attributable to the sale of the 76.9367 Spurs units held in petitioner's name on any of their tax returns. Cash Distribution by Spurs to Petitioner
On August 12, 1982, the Spurs distributed $ 200,000 to its partners. This cash distribution was proposed and approved at the meeting of the board of directors of Concessions, Inc., on July 23, 1982, the same meeting at which the board discussed the sale of the interests of the McCombs group in the Spurs. The minutes of that board meeting refer to the $ 200,000 distribution as follows: President Drossos then advised the Board that he recommended a $ 200,000 Return of Capital to the Partners. After a full discussion, a motion *625 was made and passed authorizing the payment of $ 200,000 as a Return of Capital to the Investors, and said payment to be made 8-12-82 to Investors of Record 7-23-82. On July 23, 1982, the record date for the distribution, petitioner was the record owner of 76.9367 Spurs units which was equivalent to 3.0267 percent ownership of the Spurs organization. Accordingly, petitioner received a check drawn to its order for $ 6,053.40, or 3.0267 percent of $ 200,000, as its share of the distribution. Each Spurs unit entitled its holder to receive $ 78.68. Thus, the portion of the distribution allocable to the 37.9367 units originally purchased by petitioners is $ 2,984.88 and the portion allocable to the 39 units originally purchased by Mr. Thomas is $ 3,068.52. There is no evidence in the record that the $ 6,053.40 distribution or any portion of it was paid to any of petitioner's shareholders. In fact, Schedule L of petitioner's income tax return for fiscal year 1983 reports the distribution as a reduction of petitioner's investment in its 37.9367 Spurs units from $ 170,000 to $ 163,946.60. The distribution is not otherwise reported on the return. Nevertheless, the parties orally stipulated *626 at trial that before the beginning of the fiscal year 1983, petitioner had no adjusted basis in its Spurs partnership interest. Respondent's treatment of the transactions involving the Spurs Units
The notice of deficiency explains respondent's determination regarding the above transactions involving the 76.9367 Spurs units held in petitioner's name as follows: It is determined that you realized ordinary income of $ 162,544.86 for the June 30, 1983 tax year resulting from a cash distribution from a partnership and gain on the sale of a partnership interest. Accordingly, your taxable income is increased $ 162,544.86 for the tax year ended June 30, 1983. Thus, respondent determined that petitioner realized ordinary income during its fiscal year 1983, consisting of the distribution of $ 6,053.40 received by petitioner from the Spurs and the cash payments totaling $ 156,491.46, which were made by Messrs. Zeller and Huntress for their purchase of 28.67 of the 76.9367 Spurs units held by petitioner. He did not charge petitioner with any gain attributable to the remaining 48.2667 Spurs units involved in the transaction with Mr. Drossos. Respondent took the position that no *627 completed sale of those units was made to Mr. Drossos. Personal Holding Company
Petitioner's status as a personal holding company during the years in issue turns on the facts relating to two promissory notes. One of the notes was discussed above. It is dated October 1, 1979, and was made by Mr. Thomas in the principal amount of $ 97,500. Mr. Thomas issued the note to petitioner in return for petitioner's assignment to him of the additional 39 Spurs units for which petitioner subscribed in 1979. As mentioned above, petitioner had given the Spurs its own promissory note in the principal amount of $ 97,500 dated October 1, 1979, to acquire the Spurs units and Mr. Thomas' note carried identical terms to those set forth in petitioner's note. It was noted above that petitioner booked its promissory note to the Spurs in a liability account entitled "Notes Payable-Spurs" and booked Mr. Thomas' promissory note in an asset account entitled "A/R Charlie Thomas for Spurs." It did not treat the 39 additional Spurs units as an asset. It should also be noted, however, that Mr. Thomas did not formally assume any liability under petitioner's promissory note to the Spurs nor did he formally *628 guarantee payment of the note to the Spurs. In fact, Mr. Thomas' participation in the purchase of the additional 39 units was not disclosed to the Spurs. In March of 1982, petitioner executed a second note in the principal amount of $ 3,852.68 in connection with the purchase of the 39 additional Spurs units. This amount was added to the account receivable from Mr. Thomas, but the record does not reveal that Mr. Thomas executed a note to petitioner in that amount. Petitioner's account entitled "A/R Charlie Thomas for Spurs" reveals that Mr. Thomas' promissory note to petitioner remained outstanding from October 1, 1979, to October 9, 1983. On that date, a credit was made to the account in the amount of $ 101,352.68, the sum of the two notes. A debit in the same amount was made on the same date to the account reflecting petitioner's liability to the Spurs. According to petitioner's books, therefore, Mr. Thomas' promissory note was outstanding at the end of fiscal year 1983, and was not paid until during the company's fiscal year 1984. The second promissory note which has an impact on petitioner's status as a personal holding company is a promissory note dated July 1, 1980, in *629 the principal amount of $ 300,000 issued to petitioner's order by "Gary V. Woods, Nominee for Lynda McCombs Rubey, Marsha McCombs Shields, and Connie McCombs McNab," Mr. McCombs' three daughters. This note provides for interest at 10 percent and was due and payable on or before July 1, 1982. Petitioner booked the note as a debit to an account entitled "Accts. Receivable Gary Woods -- Nominee." Shortly after receiving the note, petitioner borrowed $ 300,000 from a San Antonio bank and pledged the note as collateral for that loan. $ 218,000 of the principal amount of the note remained outstanding on July 1, 1982, the beginning of petitioner's 1983 fiscal year. On November 30, 1982, LYMARCO paid petitioner $ 100,000 on the note, of which $ 93,715 was principal and $ 6,285 was interest. Petitioner reported the interest as income for Federal income tax purposes. The note was finally paid in full on December 6, 1982. Petitioner's financial statements and its Federal income tax returns for the years in issue do not reflect a contribution to petitioner's capital by LYMARCO or any other shareholder, other than the original paid-in capital of $ 1,000. Conceded Bad Debt Adjustments *630 -- Additions to Tax
Prior to fiscal year 1983, petitioner had never established the reserve method of treating bad debts nor had it maintained proper reserve accounts for bad debts as contemplated by section 1.166-4, Income Tax Regs. Rather, petitioner had computed its deduction for bad debts based upon the amount of specific debts which were ascertained to be worthless during the year. Nevertheless, for fiscal years 1983 and 1984, petitioner computed its bad debt deduction using a so-called reserve method. Petitioner never sought permission from respondent to make this change. In his notice of deficiency, respondent disallowed $ 78,033.61 and $ 15,000 of the bad debt deductions claimed on petitioner's income tax returns for fiscal years 1983 and 1984, respectively. Petitioner concedes the correctness of these adjustments but the facts pertaining thereto are relevant with respect to the additions to tax. As previously mentioned, for a number of years Courtesy Ford reimbursed petitioner for bad car loans that were 90 days or less past due at the time petitioner repossessed the car. After interest rates began to climb in the late 1970s and by the end of petitioner's fiscal *631 year 1983, the number of petitioner's repossessions had quadrupled and the amount of its annual losses had increased tenfold. Petitioner also had difficulty returning cars to Courtesy Ford within 90 days because many of its debtors were leaving the State to seek jobs elsewhere. As business deteriorated, the management of Courtesy Ford took the position that it was no longer in a position to continue repurchasing cars which were collateral for petitioner's bad loans and it advised petitioner that petitioner would have to begin absorbing all of its bad debt losses. Until that time, petitioner had used the specific charge-off method of accounting for its bad debts. During the fiscal year 1983, petitioner established a bad debt reserve on the advice of its bankers and an outside accounting firm who recommended the amount petitioner should reflect in its bad debt reserve, i.e., $ 78,033.61 in its fiscal year 1983, and $ 15,000 in its fiscal year 1984. Mr. E. C. Schmidt, petitioner's assistant secretary-treasurer, prepared its tax returns for the years in issue. He was a certified public accountant who had worked as a tax accountant for the accounting firm of Arthur Andersen and Company *632 in Houston before he began working for petitioner. In 1983, Mr. Schmidt believed that petitioner did not need to seek permission from the Internal Revenue Service to change its method of accounting for its bad debt losses because there was a change in its operations. Furthermore, he believed that petitioner's bad debt losses from prior years net of recoveries were insignificant and irrelevant to the bad debt reserves established in 1983. Consequently, he did not prepare a Schedule F, Bad Debt -- Reserve Method, for petitioner's Federal income tax return. OPINION Issue 1. Treatment of Payments to Shareholders -- Reasonable Compensation or Dividends
Section 162(a)(1) allows a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." Section 1.162-7(a) and (b)(1), Income Tax Regs., provides in pertinent part: The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. * * * Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. See Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339, 347 (1957), *633 affd. 261 F.2d 842 (9th Cir. 1958). Thus, a taxpayer must show that the amount paid as compensation (1) is "reasonable" and (2) is for services actually rendered. Close scrutiny is given to deductions claimed for payments made by a corporation controlled by those to whom the payments are made. If the payments are distributions of earnings, rather than compensation for services rendered, they are not deductible. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151-152 (8th Cir. 1974), affg. T.C. Memo 1973-130; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). Petitioner argues that the amounts paid to its four shareholders in fiscal year 1983, and to Mr. Thomas and Mr. Daniell in fiscal year 1984, are deductible as reasonable compensation for actual services rendered, past and present. Respondent contends that the payments are dividends. We agree with respondent for fiscal year 1983, and petitioner for fiscal year 1984. In our opinion, the amounts petitioner paid to its shareholders in both fiscal years, in comparison with the services performed, are reasonable. When averaged *634 over the years during which these shareholders were involved with petitioner, the payments are relatively modest in amount. Suffice it to say that we have considered the various factors frequently used to determine reasonableness of compensation, as set forth in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), affg. a Memorandum Opinion of this Court, and Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315 (5th Cir. 1987), affg. T.C. Memo 1985-267. The crux of the dispute between the parties over this issue is whether the payments made in the fiscal years 1983 and 1984 were, in fact, compensation for services actually rendered. It is settled law that a payment is deductible as compensation only if it is made with the intent to compensate. Whether the taxpayer has demonstrated such intent is a factual question to be decided on the basis of the particular facts and circumstances of the case. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Petitioner relies heavily on the fact that *635 it booked the payments as "management fees." However, bookkeeping entries are not conclusive. We look to all the facts and circumstances, not just to bookkeeping entries. Wood v. Commissioner, 93 T.C. 114, 120 (1989). Based on the facts for fiscal year 1983, we conclude that the $ 100,000 distribution made to the four shareholders on August 31, 1982, did not constitute compensation for services rendered, but was a distribution of petitioner's earnings and profits. Several facts support this conclusion. First, Mr. Thomas admitted at trial that he decided the amount to be paid to each shareholder without considering the time and effort any of them had expended on behalf of petitioner. Second, the distribution was paid solely to shareholders in direct proportion to their stock ownership. Third, almost half of the total distribution was made to LYMARCO and Mr. Sulephen, neither of whom was employed by or rendered services to petitioner. Mr. Sulephen provided advice and business contacts for petitioner, but he rendered such services to Courtesy Ford in his capacity as its manager, and they were not services rendered to petitioner. By the same token, when Mr. *636 Woods consulted with petitioner's employees, he was rendering services to McCombs Enterprises and LYMARCO. We reject petitioner's claim that LYMARCO provided services to petitioner through its agent, Mr. Woods. Both Mr. Sulephen and LYMARCO were shareholders and had an obvious interest in petitioner's profitability in that capacity. Our conclusion on this point is supported by Mr. Woods' testimony at trial which links the payment to LYMARCO with the fact that it was shortly to give up its ownership interest in petitioner. He stated: In light of the fact that LYMARCO would no longer be owners, we thought it appropriate that we be compensated for our efforts prior to the time of redeeming our stock. For these reasons, we think the payments made in the fiscal year 1983 were not intended as compensation for services rendered, and, therefore, are not deductible by petitioner as ordinary and necessary business expenses. They were dividends. We reach a different conclusion, however, with respect to the payments made in the fiscal year 1984. We believe those amounts were paid to Mr. Thomas and Mr. Daniell as compensation for services to petitioner. Both Mr. Thomas and Mr. Daniell *637 rendered services in their respective capacities as petitioner's officers and directors. The payments were made to Mr. Thomas and Mr. Daniell at different times during the year and were not proportionally related to their stockholdings. Petitioner also made a payment in 1984 to Ms. Overstreet, another officer of petitioner who did not own any of its stock. We conclude that the payments made in the fiscal year 1984 to Mr. Thomas and Mr. Daniell were reasonable compensation for personal services rendered, and thus are deductible by petitioner as ordinary and necessary business expenses. Issue 2. Ownership of the Spurs Units Sold to Messrs. Zeller and Huntress
In the summer of 1982, petitioner held 79.9367 Spurs units in its name, consisting of the 37.9367 units which it purchased in 1976 for $ 170,000 and the 39 units which Mr. Thomas purchased through petitioner in 1979. On August 12, 1982, petitioner received a distribution from the Spurs in the amount of $ 6,053.40 based upon petitioner's record ownership of 76.9367 units. Thereafter, in two arm's-length sales, Messrs. Zeller and Huntress paid a total of $ 156,491.46 to purchase 28.67 of petitioner's Spurs units and Mr. *638 Drossos acquired the remaining 48.2667 units for $ 263,457.53, which he paid by issuing the promissory note described above. Respondent determined in his notice of deficiency that petitioner's taxable income for fiscal year 1983 should be increased by $ 162,544.86, the sum of the distribution from the Spurs, $ 6,053.40, and the aggregate amount paid by Messrs. Zeller and Huntress, $ 156,491.46. Respondent made no adjustment to petitioner's income based upon the amount which Mr. Drossos paid by promissory note. Respondent took the position that no completed sale to Mr. Drossos had taken place. As to the distribution from the Spurs, respondent's notice of deficiency is premised on petitioner's continued ownership of the 37.9367 units on August 12, 1982, the date of the distribution. In the notice of deficiency, respondent took the position that the entire distribution of $ 6,053.40 should be included in its income as ordinary income. Respondent now concedes that petitioner did not own the 39 units which Mr. Thomas originally purchased and that petitioner's income should be increased only by the amount attributable to petitioner's 37.9367 units, that is, $ 2,984.88 (37.9367 x $ *639 78.68 per unit). Petitioner argues that it is not subject to tax on any part of the subject distribution because by August 12, 1982, petitioner had given its 37.9367 Spurs units to LYMARCO in redemption of LYMARCO's stock in petitioner. This is the same redemption which was purportedly undertaken under the terms of the so-called exchange agreement, described above, which states that it "is made effective August 31, 1982," that is, after the distribution was made. Therefore, according to petitioner's own documentary evidence, petitioner owned the Spurs units at the time of the distribution. It also appears that petitioner received the total distribution and treated it for tax purposes as a reduction of its investment in the Spurs units. For these reasons and for the other reasons discussed below, we hold that petitioner has not proved its factual contention that LYMARCO owned the Spurs units when the distribution was made. Thus, we sustain respondent's determination that the portion of the distribution paid with respect to petitioner's 37.9367 Spurs units is includable in its income as a distribution under section 731(a). As to the sales to Messrs. Zeller and Huntress, respondent *640 took the position in his notice of deficiency and takes the position here that petitioner sold 28.67 Spurs units during fiscal year 1983 from among its 37.9367 Spurs units and realized $ 156,491.46 from such sales. Petitioner contends that respondent's determination is wrong because it assumes that petitioner owned the 28.67 Spurs units sold to Messrs. Zeller and Huntress when, in fact, those units had been distributed to LYMARCO in the redemption mentioned above. It also contends that respondent's determination is wrong because it assumes that the units sold to Messrs. Zeller and Huntress came from petitioner's 37.9367 Spurs units when, in fact, they came from Mr. Thomas' units. In sum, petitioner contends that the Spurs units sold to Messrs. Zeller and Huntress were owned either by LYMARCO or Mr. Thomas but, in any event, they were not owned by petitioner and respondent's determination is factually incorrect in concluding otherwise. Petitioner does not raise any other issue concerning respondent's treatment of the subject transaction nor does it argue that the sales proceeds should be treated as from the sale or exchange of a capital asset. Petitioner's principal contention *641 is that the Spurs units sold to Messrs. Zeller and Huntress were owned by LYMARCO. It contends that LYMARCO had acquired all 76.9367 Spurs units before the sales to Messrs. Zeller and Huntress were made. According to petitioner, the 37.9367 Spurs units which it had owned were transferred to LYMARCO in redemption of LYMARCO's stock in petitioner under the exchange agreement mentioned above. Petitioner claims that this redemption was prompted by Mr. Thomas who explained to Mr. Woods that petitioner was contracting its business and suggested that petitioner redeem LYMARCO's stock in petitioner in exchange for the 37.9367 Spurs units which petitioner held. Petitioner claims that this redemption took place in early July of 1982, even though the exchange agreement states that it took place "effective August 31, 1982." According to petitioner, the 39 Spurs units which had been owned by Mr. Thomas were acquired by LYMARCO, in exchange for LYMARCO's assumption of the outstanding indebtedness on the units. Petitioner contends that in June or early July of 1982, Mr. Thomas proposed to Mr. Woods that LYMARCO acquire Mr. Thomas' 39 Spurs units in exchange for assuming the debt of $ 101,352.68 *642 on the units. Mr. Woods agreed, and LYMARCO thus acquired the units. Petitioner asserts that after late June or early July of 1982, LYMARCO exercised "complete dominion and control over the units and had all the rights and burdens of ownership." In support of that assertion, it claims that LYMARCO negotiated the sales to Messrs. Zeller, Huntress, and Drossos and it notes that LYMARCO took the cash proceeds from those sales. As proof that LYMARCO acquired Mr. Thomas' Spurs units, petitioner points out that LYMARCO paid $ 4,315.13 to the Spurs as interest on the $ 101,352.68 indebtedness incurred when Mr. Thomas purchased those units. That interest was from December 15, 1981, to August 31, 1982. Finally, petitioner explains that it did not report its redemption of LYMARCO's stock because the redemption was covered by the nonrecognition provisions of section 311 as in effect through August 31, 1982. Based on the record of this case, we hold that petitioner did not prove that LYMARCO owned the Spurs units sold to Messrs. Zeller and Huntress and, accordingly, we hold that petitioner failed to prove its contention that LYMARCO, not petitioner, realized the proceeds from those sales. *643 In the first place, we are unwilling to find that LYMARCO acquired petitioner's 37.9367 Spurs units in exchange for LYMARCO's stock in petitioner. The exchange agreement does not so provide. What it does provide is an exchange of LYMARCO's stock in return for petitioner's "rights, title, and interest in the proceeds of 37.9367" Spurs units (emphasis supplied). We think the terms of that agreement describe the transaction as it happened: Petitioner sold its Spurs units and gave the "proceeds" of that sale to LYMARCO in exchange for LYMARCO's stock in petitioner. The fact that petitioner gave LYMARCO the checks totaling $ 156,491.46 from Messrs. Zeller and Huntress is consistent with the agreement and does not prove, as petitioner contends, that LYMARCO owned the units at the time they were sold to Messrs. Zeller and Huntress. The parties structured the transaction in this form and recorded the form of the transaction in the exchange agreement. A taxpayer is generally held to the form in which he chooses to cast a transaction, even though, in hindsight, another form may have resulted in less tax liability. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149, 40 L. Ed. 2d 717, 94 S. Ct. 2129 (1974); *644 Legg v. Commissioner, 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974). There is nothing in the record of this case to suggest that the exchange agreement did not accurately record the agreement between petitioner and LYMARCO to exchange LYMARCO's stock for whatever proceeds petitioner realized from its sales of the Spurs units. Certainly, the fact that Mr. McCombs and his financial adviser, Mr. Woods, negotiated the sale of petitioner's Spurs units is understandable in view of Mr. McCombs' close relationship to the Spurs as a founder of the organization and as a member of the board of directors of Concessions, Inc., and is consistent with his relationship to petitioner as a member of its board of directors. In any event, there is nothing in the record to prove that Mr. McCombs was acting on behalf of LYMARCO and not petitioner. There is also nothing in the record to support petitioner's assertion that from June or July of 1982 LYMARCO exercised complete dominion and control over the Spurs units held in petitioner's name. Indeed, the fact that petitioner received and retained the cash distribution of $ 6,053.40 from the *645 Spurs proves the opposite. Moreover, Messrs. Zeller and Huntress each made his check to purchase the Spurs units payable to petitioner and, when asked at trial if he had ever heard of LYMARCO, Mr. Huntress replied that he had not and that he had never dealt with such an entity. Finally, the documents associated with the purchase of such units involve only the purchasers and petitioner. In the second place, we are unwilling to find that LYMARCO acquired Mr. Thomas' Spurs units in exchange for petitioner's assumption of Mr. Thomas' obligations under the two promissory notes in the aggregate amount of $ 101,352.68. We do not believe that Mr. Thomas, a successful businessman who is knowledgeable about the NBA, would have exchanged his 39 Spurs units for LYMARCO's assumption of indebtedness in the amount of $ 101,352.68 or approximately $ 2,600 per unit, when the same units were sold for more than twice that price only 2 months later. Moreover, petitioner offered nothing to document the alleged sale of Mr. Thomas' Spurs units to LYMARCO. In light of the other carefully drafted and contemporaneous documentation that petitioner produced regarding its other transactions involving Spurs *646 units -- particularly board resolutions, promissory notes, and bookkeeping entries -- we doubt that Mr. Thomas' sale of Spurs units to LYMARCO would have gone undocumented. We infer from petitioner's failure to introduce evidence of this alleged sale that the evidence would have been unfavorable if introduced. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The fact that LYMARCO paid $ 4,315.13 to the Spurs as interest on the $ 101,352.68 indebtedness does not prove that LYMARCO acquired Mr. Thomas' 39 Spurs units in June or July of 1982 nor can we infer from that payment that LYMARCO owned Mr. Thomas' Spurs units. To draw such an inference would require us to disregard the possibility that LYMARCO paid the interest to disguise Mr. Thomas' ownership of the units at that time. Furthermore, Mr. James Steger, the accountant for McCombs Enterprises, prepared a schedule which allocated the proceeds of the sales to Mr. Zeller and Mr. Huntress among Mrs. McCombs, her three daughters, Mr. Thomas, and petitioner. No allocation was made to LYMARCO, and the amounts allocated to the three McCombs *647 daughters were based solely on their individual ownership in the Spurs. The allocations to Mr. Thomas and petitioner were based on their ownership of 39 and 37.9367 units, respectively. Petitioner makes an alternate contention. It argues that, even if the Court does not find that Messrs. Zeller and Huntress purchased their Spurs units from LYMARCO, the 28.67 units which they purchased came from Mr. Thomas' 39 units, rather than from petitioner's 37.9367 units. Petitioner argues that its units were included in the invalidated sale to Mr. Drossos. As a predicate for this contention, petitioner notes that the 28.67 Spurs units sold to Messrs. Zeller and Huntress were subject to a lien to the Spurs. Thus, petitioner argues, the units sold to Messrs. Zeller and Huntress must have come from the 39 units previously owned by Mr. Thomas on which the two notes in the aggregate amount of $ 101,352.68 were still outstanding and could not have come from the 37.9367 units originally owned by petitioner on which all indebtedness had been paid. Although we acknowledge that petitioner had paid its original debt in full, it is still possible that all 76.9367 Spurs units in petitioner's hands *648 were encumbered by a lien. Petitioner did not introduce the security agreements for the 1976 or 1979 purchases of the Spurs units and the record does not otherwise prove that the lien on the original units was removed and was not extended to all units in petitioner's hands where the additional 39 units were purchased. The following testimony of Colonel Holden at trial suggests that all of petitioner's units were subject to a lien: Q The -- do you recall whether the units which were transferred to Mr. Huntress and Mr. Zeller had liens attached to them? A We -- my attorney, Mr. Webster, advised me that all the units had a lien on the units from our starting days, and he advised me that the units that Mr. Huntress and Mr. Zeller had purchased, by virtue of that prior history, there was a lien attached, and advised me that it would be necessary for the Board to take action to remove that lien -- those liens. Moreover, if it is true, as petitioner argues, that its 37.9367 units were not subject to a lien and Mr. Thomas' units were, we are at a loss to know why petitioner's units were not transferred to Messrs. Zeller and Huntress. Stated differently, we are at a loss to understand *649 why the parties to the transaction would have chosen to complicate it by transferring the units which were subject to a lien. We do not think that they would have done so. Accordingly, we infer that all 76.9367 Spurs units in petitioner's name were covered by a lien to secure payment of the outstanding indebtedness to the Spurs. For these reasons, we hold that petitioner failed to prove that Mr. Zeller and Mr. Huntress bought their units from Mr. Thomas. Accordingly, based on this record, we hold that in August or September of 1982 petitioner sold 28.67 Spurs units to Mr. Zeller and Mr. Huntress for $ 156,491.47. Therefore, we sustain respondent's determination that petitioner realized the gain from those sales. Issue 3. Personal Holding Company Tax Liability
A personal holding company tax equal to 50 percent of "undistributed personal holding income" is imposed by section 541 on every corporation which qualifies as a "personal holding company," under the definition of that term contained in section 542(a). The personal holding company tax rate was later changed by Congress to 28 percent, in the case of taxable years beginning in 1987. Tax Reform Act of 1986, Pub. L. *650 99-514, sec. 104(b)(8), 100 Stat. 2085, 2105. In his notice of deficiency, respondent determined petitioner's liability for personal holding company tax as follows: It is determined that you are liable for personal holding company tax of $ 172,439.97 and $ 51,625.00 for the tax years ended June 30, 1983 and June 30, 1984, respectively. Accordingly, your tax is increased $ 172,439.97 and $ 51,625.00 for the tax years ended June 30, 1983 and June 30, 1984, respectively. Petitioner concedes that it meets the general definition of the term "personal holding company" contained in section 542(a) but argues that it is not subject to personal holding company tax for either of the 2 years at issue because it qualifies under an exception to that definition contained in section 542(c). Petitioner argues that it qualifies as a "lending or finance company" within the meaning of section 542(c)(6). Respondent concedes that petitioner meets all of the requirements to be a lending or finance company, except for section 542(c)(6)(D), which provides as follows: (D) the loans to a person who is a shareholder in such company during the taxable year by or for whom 10 percent or more *651 in value of its outstanding stock is owned directly or indirectly (including, in the case of an individual, stock owned by members of his family as defined in section 544(a)(2)), outstanding at any time during such year do not exceed $ 5,000 in principal amount; * * * Respondent contends that the promissory note in the principal amount of $ 97,500 from Mr. Thomas and the promissory note in the principal amount of $ 300,000 from Mr. Gary V. Woods, nominee for Mr. McCombs' three daughters, reflect loans to 10 percent shareholders and thus disqualify petitioner from the "lending or finance company" exception of section 542(c)(6). During fiscal year 1983, Mr. Thomas and LYMARCO were both persons who were stockholders in petitioner and they both owned more than 10 percent in value of petitioner's outstanding stock. Mr. McCombs' three daughters were the sole partners of LYMARCO. Respondent contends that the $ 97,500 promissory note from Mr. Thomas reflects a loan by petitioner in excess of $ 5,000 to Mr. Thomas which was outstanding during the entire fiscal year and disqualifies petitioner as a "lending or finance company" for that year. Similarly, respondent contends that the $ 300,000 *652 promissory note from Mr. Gary V. Woods, as nominee for Mr. McCombs' three daughters, also reflects a loan by petitioner in excess of $ 5,000 to Mr. McCombs' three daughters which was outstanding until December 9, 1982, and also prevents petitioner from qualifying as a "lending or finance company" under section 542(c)(6). During fiscal year 1984, according to the stipulation of the parties, Mr. Gary V. Woods, as "Nominee for LYMARCO," no longer owned stock in petitioner and according to petitioner's stock records, LYMARCO's stock in petitioner had been redeemed. Moreover, the $ 300,000 promissory note from Mr. Gary V. Woods as nominee was paid during the prior fiscal year. Nevertheless, Mr. Thomas continued to own more than 10 percent in value of petitioner's stock, and petitioner's loan to Mr. Thomas remained outstanding in excess of $ 5,000 during that fiscal year. Respondent contends that the loan to Mr. Thomas prevents petitioner from qualifying under the "lending or finance company" exception for that year. Petitioner concedes that each of the two transactions relied upon by respondent was booked in its general ledger to "receivable accounts" and "appeared to * * * constitute *653 loans to shareholders." Nevertheless, petitioner contends that neither of the transactions involved a "loan" within the meaning of section 542(c)(6)(D). In the case of the transaction with Mr. Thomas, petitioner contends that it did not involve a loan or extension of credit to Mr. Thomas. Petitioner claims that it merely acted as a "conduit" to allow Mr. Thomas to purchase the 39 additional units which were offered by the Spurs organization to existing unit holders. Petitioner argues that "the real obligation ran from Mr. Thomas to the Spurs" and that all of its directors and officers expected Mr. Thomas to pay the obligation to the Spurs. Petitioner notes that Mr. Thomas had ample financial resources to do so. Petitioner does not argue that its "loan" to Mr. Thomas should not be counted under section 542(c)(6)(D) on the ground that it was paid or otherwise satisfied prior to fiscal year 1984 and simply remained on petitioner's books through oversight or inadvertence. In this connection, we note that petitioner does not contend that the promissory note from Mr. Thomas was canceled or otherwise discharged when, during the summer of 1982, LYMARCO allegedly acquired his 39 Spurs *654 units and assumed petitioner's indebtedness to the Spurs. In the case of the receivable from LYMARCO, petitioner argues that it did not advance cash or property to LYMARCO but that the transaction was a "capital contribution which reimbursed petitioner for the cash expended on the operation, maintenance and debt service of Indian Creek Ranch." Petitioner's position is that in 1978 it purchased an undivided 80-percent interest in a commercial hunting ranch located near Kerrville, Texas, at Mr. McCombs' suggestion. He believed that the ranch would ultimately prove to be a good investment for petitioner. However, after operating the ranch for approximately 1 year, it was clear that petitioner could not afford the cash drain. Accordingly, in July 1979, petitioner transferred its interest in the ranch to Mr. Sulephen, to a nominee for Mr. McCombs' three daughters, and to a nominee for Mr. Thomas' three daughters. Ultimately, LYMARCO ended up with all of the property. Petitioner claims that in July 1980, LYMARCO voluntarily contributed $ 300,000 to petitioner to reimburse it for "the approximate amount that petitioner had spent in the maintenance and operation of the ranch and the *655 debt service over the period 1978 to 1979 when it owned the ranch." Petitioner does not argue that the loan to Mr. Gary V. Woods, Nominee for Linda McCombs Rubey, Marsha McCombs Shields, and Connie McCombs McNab, should not be counted under section 542(c)(6)(D) on the ground that petitioner's stock was owned by LYMARCO, not by Mr. Gary V. Woods as nominee, and that the latter was not a 10-percent shareholder. See sec. 544(a)(2). The parties make no distinction between LYMARCO and Mr. Gary V. Woods as nominee for Mr. McCombs' daughters and, therefore, neither shall we. At the outset, we note that the personal holding company provisions impose a special tax which is complex in operation. A taxpayer may unwittingly stumble into the status of a personal holding company without any intention of engaging in the activity which Congress sought to prevent, namely avoiding the higher tax rates imposed on wealthy individuals by leaving investment-type income in corporate solution. Nevertheless, it is well settled that the personal holding company provisions provide for a mechanical test in which a taxpayer's motive is irrelevant. Bell Realty Trust v. Commissioner, 65 T.C. 766, 775 (1976), *656 affd. without published opinion 546 F.2d 413 (1st Cir. 1976); see Krueger Co. v. Commissioner, 79 T.C. 65 (1982). We are persuaded that the transactions with Mr. Thomas and LYMARCO were loans. The objective criteria used in deciding such a factual issue are present in this case. See Fidelity Commercial Co. v. Commissioner, 55 T.C. 483, 487-488 (1970), affd. 1971 U.S. App. LEXIS 8254, 28 A.F.T.R.2d (RIA) 5751, 71-2 U.S. Tax Cas. (CCH) P9667 (4th Cir. 1971). Both Mr. Thomas and LYMARCO signed notes payable to petitioner in the amounts shown on its books as due. Both notes provided that interest at a specified rate would be paid. With respect to the LYMARCO note, petitioner received interest and reported it as income for its fiscal year 1983. Here again, petitioner is attempting to reject the form in which the transactions were cast and, here again, we emphasize that once a taxpayer has chosen the form of a transaction, generally he must live with its consequences. Legg v. Commissioner, 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974). A taxpayer bears a heavy burden to prove that *657 the substance of a transaction actually differs from its chosen form. Glacier State Electric Supply Co. v. Commissioner, 80 T.C. 1047, 1053 (1983). As to the Thomas loan, the record demonstrates that Mr. Thomas wanted to buy Spurs units when the Spurs offered original unit holders the opportunity to do so in 1979. He could not purchase the units outright because he was not an original unit holder. Petitioner, however, could take advantage of the opportunity because it was an original unit holder. Thus, petitioner was an integral part of the purchase. Moreover, Mr. Thomas issued his promissory note to petitioner in the amount of the purchase price and petitioner issued its promissory note to the Spurs in the same amount. Both notes provided for 6 percent annual interest and carried identical terms. However, they were separate obligations. Mr. Thomas did not assume or guarantee petitioner's obligation to the Spurs and his ownership of the 39 additional units and promissory note to petitioner were not disclosed to the Spurs. Petitioner's obligation to make payments to the Spurs was not contingent upon receiving money from Mr. Thomas. The Spurs looked to *658 petitioner to make payments and petitioner would be required to satisfy that obligation even if Mr. Thomas did not pay a like amount to it. We disagree with petitioner that it was "merely a convenient conduit" for Mr. Thomas, and that this case is governed by Oak Hill Finance Co. v. Commissioner, 40 T.C. 419 (1963). In that case, we held that certain "advances" by a subsidiary to its parent which were evidenced by demand notes from the parent were not "loans" within the meaning of a predecessor of section 542(c)(6)(D) because the subsidiary was merely a conduit for loans made by a third party to the parent. We found that the lender "intended to extend its credit solely to Grable," the parent, and that the parent's demand notes and other indications of indebtedness were mere "formalities" without "underlying substance." Oak Hill Finance Co. v. Commissioner, supra at 431. In this case, to the contrary, the Spurs were not advised of Mr. Thomas' part in the transaction and petitioner's promissory notes were not mere formalities without substance. We agree with respondent that this case is similar to Bell Realty Trust v. Commissioner, 65 T.C. 766, *659 affd. without published opinion 546 F.2d 413 (1st Cir. 1976), where we held that the taxpayer was not a "mere conduit" in respect of interest payments received by it. As to the LYMARCO loan, petitioner asserts that the LYMARCO promissory note issued on or about July 1, 1980, was intended to reimburse petitioner for the cash expenditures which it made approximately 1 year earlier while operating Indian Creek Ranch. Petitioner is asking the Court to find that, 1 year after it made a bad investment and incurred expenses related to the investment, one of its shareholders voluntarily agreed to reimburse the corporation for those expenditures. Certainly, it is possible that a shareholder would do that in order to maintain smooth relations with fellow shareholders, as petitioner contends. However, we are not willing to make such a finding based upon the record in this case. The only evidence in the record that LYMARCO intended to make a $ 300,000 capital contribution to petitioners consists of unconvincing testimony from interested parties at trial. On the other hand, the record contains contemporaneous documentary evidence which shows that petitioner and LYMARCO consistently *660 treated the promissory note as a loan. All of the objective facts in the record, therefore, suggest that the transaction constitutes a loan and we so find. See Texas Farm Bureau v. United States, 725 F.2d 307 (5th Cir. 1984); Harlan v. United States, 409 F.2d 904 (5th Cir. 1969); Dallas Rupe & Son v. Commissioner, 20 T.C. 363, 369 (1953). Accordingly, based on the facts contained in this record, we hold that petitioner did not qualify as a lending or finance company under section 542(c)(6) for the fiscal years 1983 and 1984. It therefore follows that petitioner is liable for the personal holding company tax determined by respondent. Issue 4. Section 6653(a)(1) and (2) Additions to Tax
Section 6653(a)(1) provides a 5-percent addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of respondent's rules or regulations. Section 6653(a)(2) provides an addition to tax equal to 50 percent of the interest due with respect to any portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. For purposes of this statute, negligence is *661 the "lack of due care or failure to do what a reasonable and prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent determined additions to tax for negligence under section 6653(a)(1) and (2) for both fiscal years. Petitioner has the burden of proving that the additions are not appropriate. Rule 142(a), Tax Court Rules of Practice and Procedure; Johnson v. Commissioner, 74 T.C. 89, 96 (1980), affd. 673 F.2d 262 (9th Cir. 1982). Petitioner contends that it prepared its income tax returns for the years in issue based upon the advice which it received from its certified public accountants. Accordingly, it contends that it is not subject to additions to tax for negligence under section 6653(a)(1) and (2). We agree that good faith reliance on the advice of an accountant can, in certain cases, constitute a defense to the additions to tax under section 6653(a)(1) and (2). See, e.g., Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). However, that defense is not applicable here. Petitioner engaged an outside accounting firm to prepare its working *662 trial balance and some associated workpapers. Its tax returns were not prepared by the outside accountant. They were prepared by petitioner's assistant secretary-treasurer, Mr. E. C. Schmidt. Prior to his employment by petitioner, Mr. Schmidt had been employed by Arthur Andersen and Company as a certified public accountant. It was Mr. Schmidt who caused petitioner to treat the payments to shareholders in fiscal year 1983 as management fees and to claim them as a deductible expense. It was Mr. Schmidt who caused petitioner not to include petitioner's gain on the sale of its Spurs units, and it was Mr. Schmidt who decided that petitioner need not submit Schedule F to its income tax returns for fiscal years 1983 and 1984, even though it claimed bad debt deductions under a reserve method. Petitioner did not prove that its outside accountants advised petitioner to take those positions or that Mr. Schmidt relied in good faith on such advice. Petitioner presented no other argument or evidence to show why these additions should not be imposed. Therefore, we sustain respondent's determination as to the addition under section 6653(a)(1). Because, as discussed above, one or more parts *663 of the underpayment is due to petitioner's negligence, all of the underpayment is subject to the addition under section 6653(a)(1). However, contrary to respondent's determination, we do not find that the underpayment is entirely due to petitioner's negligence. Accordingly, we must review each portion of the underpayment to redetermine which is due to negligence and which is not due to negligence. The addition to tax under section 6653(a)(2), of course, applies only to the portion of the underpayment which is due to petitioner's negligence. As to the portion of the underpayment attributable to petitioner's deduction of the "management fees" for fiscal year 1983, we find that portion to be due to petitioner's negligence because the payments to shareholders were clearly dividends. Thus, we sustain respondent's determination as to that portion of the underpayment. As to the portion of the underpayment attributable to the gain realized from petitioner's sale of its Spurs units, we also find that portion to be due to petitioner's negligence. Petitioner's position that LYMARCO acquired all of the Spurs units in June or July of 1982 is not supported by any contemporaneous documentation. *664 In fact, the only documentation which was introduced at trial, the exchange agreement, states that LYMARCO exchanged its stock in petitioner for the "proceeds" of the spurs units. No documentation of Mr. Thomas' alleged sale to LYMARCO was introduced at trial. Accordingly, we sustain respondent's determination as to that portion of the underpayment. For the same reasons, we sustain respondent's determination of the section 6653(a)(2) addition to tax with respect to the portion of the underpayment attributable to petitioner's pro rata share of the cash distribution received from the Spurs. As to the portion of the underpayment attributable to the personal holding company tax, we decline to sustain respondent's determination of the addition to tax under section 6653(a)(2) with respect to that portion of underpayment because of the "highly complicated statutory provisions" involved and because petitioner may have "stumbled unwittingly into the status of a personal holding company." See Bell Realty Trust v. Commissioner, supra at 772, 775. Finally, as to the portion of the underpayment attributable to petitioner's deduction of additions to a bad debt reserve, *665 we conclude that petitioner was negligent. Petitioner argues that it was not negligent in taking the deduction without seeking prior permission from respondent because a "radical change in economic circumstances" caused Courtesy Ford to stop absorbing losses on loans which were 90 days or less past due. According to petitioner, this represented a "change in underlying facts" within the meaning of section 1.446-1(e)(2)(ii)(b), Income Tax Regs. Respondent disagrees. We need not resolve that dispute because, in any event, petitioner's negligence is shown by the fact that it intentionally failed to complete Schedule F, Bad Debts -- Reserve Method of its return. The explanation of its secretary-treasurer who prepared the return, formerly a tax accountant with Arthur Andersen and Company, that the aggregate bad debt losses, net of recoveries, deducted by petitioner prior to the years at issue were "insignificant," does not justify petitioner's failure to include Schedule F with its returns for the years in issue. Issue 5. Section 6661 Additions to Tax
Section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial *666 understatement of income tax which is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498 (1988). In the case of a personal holding company, an understatement is a "substantial understatement" if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). Generally, the amount of the "understatement" for purposes of section 6661(a) equals the excess of the amount of tax required to be shown on the return over the amount of tax reported on the return. Sec. 6661(b)(2)(A). However, the statute further provides that the amount of the "understatement" is reduced in certain cases. Under section 6661(b)(2)(B)(i), it is reduced by the amount attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for the treatment. Treasury regulations provide that "substantial authority" refers to legal precedents which would support the taxpayer's application of the law to a given fact or set of facts. Sec. 1.6661-3(b)(2), Income Tax Regs. In evaluating whether a taxpayer's treatment of a particular item is supported by substantial authority, the weight of *667 authorities in support of the taxpayer's treatment must be substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. The weight of the authorities for the tax treatment of an item is determined using the same analysis that a court would be expected to follow in evaluating the treatment of the item. Sec. 1.6661-3(b)(3), Income Tax Regs. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs.; Antonides v. Commissioner, 91 T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990). In this case, based on our findings and conclusions, it is clear that there is a substantial understatement of petitioner's Federal income tax for the fiscal years 1983 and 1984. Nevertheless, petitioner contends that there was substantial authority for petitioner's tax treatment of the items on its returns and, consequently, it should not be subject to the addition to tax under section 6661. We disagree. In evaluating petitioner's contention that there was substantial authority, the first *668 item is petitioner's treatment of the payments to its shareholders in the fiscal year 1983 totaling $ 100,000. Petitioner treated the payments as deductible compensation, but we have found that they were dividends. All of the cases cited by petitioner are distinguishable from the facts here. They involve payments made to corporate officers or employees unlike this case which involves payments to shareholders, some of whom were not officers or employees of petitioner. Furthermore, none of the cases cited by petitioner involve "compensation" paid only on the basis of stock ownership, with no regard to the relative contributions of time and effort on the part of those who received the money. Thus, petitioner has not met its burden of proving that there was substantial authority for its treatment of the payments totaling $ 100,000 made to shareholders during fiscal year 1983. The next item is petitioner's treatment of the amount realized from its sale of the Spurs units. Petitioner has failed to convince us of its version of the facts and it has offered no substantial authority for its position that another entity owned the Spurs units and sold them to Mr. Zeller and Mr. Huntress. *669 The same is true with respect to the third item, its treatment of the cash distribution from the Spurs, and the fourth item, its liability for the personal holding company tax. Finally, we consider whether there is substantial authority for petitioner's treatment of bad debts. Although petitioner cites authority for the proposition that it did not need to request permission to change its method of accounting, it cites no authority for the proposition that it was not required to file Schedule F with its returns for the years in issue and it offers nothing which excuses its failure to do so. Accordingly, for the above reasons, we hold that petitioner is liable for the section 6661 additions to tax at the 25 percent rate. Pallottini v. Commissioner, supra.
To reflect our conclusions on the disputed issues and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. On or about August 31, 1982, LYMARCO's shares in petitioner were redeemed. ** On October 1, 1983, Mr. Sulephen transferred his shares in petitioner to Mr. Thomas.
*↩ 50 percent of the interest due on the portion of the underpayment attributable to negligence.